THE PENNSYLVANIA RAILROAD COMPANY, appellant,

*v.*

ADAM ANGEL et ux., respondents.

1. A railroad company using, for the purposes of a terminal yard, a portion of a street over which it has only a right of way, is responsible for any nuisance, public or private, thereby created.

2. An act of the legislature cannot confer upon individuals or private corporations, acting primarily for their own profit, although for public benefit as

well, any right to deprive persons of the ordinary enjoyment of their property, except upon condition that just compensation be first made to the owners.

3. A railroad company cannot justify the maintenance of a condition of things which directly renders a dwelling-house in the neighborhood unfit for a place of residence, upon the ground that the nuisance necessarily results from the convenient transaction of the company's lawful business, and such a nuisance will be prohibited by injunction.

On appeal from a decree advised by Vice-Chancellor Bird, whose opinion follows:

This bill charges that the defendant uses its road, in the city of Camden, in such a manner as to create a nuisance, to the injury of the complainants. This nuisance, it is alleged, arises from the use of the several tracks, in distributing cars when loaded trains come in, and in making up loaded trains to go out from the main depot in the city. The noise of the trains, in stopping and starting, in the work of making up and distributing trains, the noise of the bells as they are rung, the noise of engine whistles, the noise of cows and calves bellowing, lambs and sheep bleating, and pigs smelling, and the smoke, dust and cinders cast from the engines, it is alleged, constitute a nuisance to the complainants, who live in the immediate vicinity, and on the line of the street through which the road passes, and right by where the work complained of is done.

The testimony shows that the defendant has three main tracks through Bridge avenue, in the city of Camden, for the use of their engines and cars. It has also a track called a "siding," used for shifting cars from one main track to another, and for distributing their cars, and for making up trains. This "siding" terminates at the residence of the complainants. At the point of termination is a switch. When freight trains arrive they frequently are stopped at or near to this switch, and the cars containing different kinds of merchandise or live stock are, one after the other, or in parcels, distributed to different places at the main station on the banks of the Delaware river. This distribution is made by repeated forward and backward movements of the engine and train, the number of times repeated depending

upon the length of the train, and the variety of freight. This work requires also the ringing of the engine bells, the blowing of the engine whistles, the emission of more or less steam, and the discharge of large quantities of smoke. The same process is applied in making up large freight trains for departure. Besides the ordinary freight, large numbers of cattle, sheep and swine are brought to the depot at Camden. This operation of making up and distributing the large freight trains, by means of the siding and switch named, brings the trains, and parts of trains, and engines, backward and forward frequently in front of the dwelling-house in which the complainants reside. In addition to the passing and repassing, these trains and engines are allowed to stand at or near the same locality for several minutes. The extent to which all this affects the peace, comfort and enjoyment of their home by the complainants, will appear in the statements of witnesses, which I shall give hereafter. The third main track has been laid within six years. The business of the defendant has greatly increased during that period. The dwelling of the complainants has been erected thirty-eight years, although I cannot perceive that time is an essential element in the question, since the owner of a city or village lot certainly has the right to place dwellings thereon, and to occupy them, whether the lot adjoins one line of travel or another. And I suppose that all men will assent to the assertion that no individual or corporation has the right to unreasonably interfere with the peace, comfort and enjoyment of such occupancy. Nor can it be material that the complainants' dwelling is fourteen or forty or more feet from the track or tracks or siding. Nuisances are not determined by distances or intervening spaces simply. Noises and stenches depend on many other agencies for their effect upon individual happiness and enjoyment. Nor can I consider the space or room for doing all this work that the company has or might have elsewhere.

I cannot but think that the question is one of right. Has the right which every citizen possesses to the comfortable enjoyment of his home been invaded by the defendant in the enjoyment of the franchise which the people have given to it? The defendant

Pennsylvania R. R. Co. *v.* Angel.

has the same right to the enjoyment of its franchise that an individual has; no more, no less. The same principles that govern the courts when soap-boilers, tallow-chandlers or the owners of slaughter-houses, brick-kilns, tanneries and the like are complained of, must govern where corporations are complained of. I cannot conceive of the right of one person or class committing an act which worketh hurt and injury to another with impunity to the transgressor, whilst in the case of another person or class such act would either be promptly restrained or punished.

I think a careful reading and consideration of the testimony, as I now give it, in the language of the witnesses, will lead the mind to a safe conclusion:

" There has been constant drilling out of the yard, up as far as Third street, and farther east, too; I suppose where the freight is loaded, the different cars are for different stations, and they pull them out of the track and back them down and cut them loose, and make up their trains for different stations going out the road, and that causes drilling up and down and cutting one off from another; these trains have been loaded with milk, coal, sheep, hogs and calves; I would notice them evenings, nearly every evening; I have heard them bawling at ten and eleven o'clock at night, at all hours of the night; in the early part of the evening, engines are lying in front of Mr. Angel's house nearly all the time; engines are lying there, drilling back and forth—engines alone."

Adam Angel, in speaking of the switch in front of his house, says:

"They use it to run in and out these cars, and they use it for drilling altogether between Second and Third streets; they have continual drilling there, running over that switch in front of my house continually; I don't believe there was ten minutes any one day or night; they are there I don't know how long at night; sometimes there will be three and four, and I have counted five, locomotives standing on that track; they stand thus oftentimes waiting to receive signals for moving, and while thus standing, they stir up their fires with this soft coal, and smoke comes out as thick as it possibly can, and blows into our houses and windows; all the windows are shut down tight or they are full of smoke, smut and black dust; if you rub a cloth over the window every day, it will be as black as your head almost.

"*Q*. What have you to say about the stock cars with the sheep and lambs?

"*A*. They are a perfect nuisance from the beginning to the end; these stock cars come out with calves that bellow away in front of us for five minutes; sometimes they run above the switch until the whole of them comes out—four

or five cars loaded with stock; won't all, perhaps, be calves, but cows, horses and bullocks, and when they get there the switch fellow gives the signal and they back down; all the time they are bellowing to the top of their voices; that is kept up all night pretty much; every night there is more or less of it; every night, on an average.

"*Q.* Is what you suffer from, from the smoke emitted from the engines passing backward and forward in front of your house?

"*A.* And the noise, the nuisance of the noise, the ringing of the bells; they are moving backwards and forwards all night, sometimes four or five bells all ringing at the same time; it is terribly annoying; of the cars running right in and right out we don't complain at all."

Mrs. Angel, one of the complainants, says:

"The engines are all the time going back and forth, drilling from morning till night; there is no intermission, and it is a great inconvenience and a great injury to the property owners; there is, all the time, dirt and dust through the house; you can't keep the front of the house open at all; the engines stand in front of the house and blow off steam, and the bells are rung; two, three, four and sometimes five engines will be standing in that locality at the same time."

John B. Thompson says:

"They drill off and on there continually, drilling from up as far as Fourth street; and those freight trains come in and stand there until they get orders to go down into the yard; engines are passing nearly all the time; I suppose there is not five minutes in the day but there is engines passing backwards and forwards; I have seen three, four, five and six engines between the house and Third street; a very thick volume of smoke flies out and cinders, and the windows are affected up as far as Fourth street; it is a thick volume of smoke that comes out when they are drilling backwards and forwards, and firing up more particularly; they get a portion of the trains made up, and they drill out in order to get them on another track, and there they pull up some more and back them until they get the train filled up; the coming in is about as bad as anything; that is the nuisance—a nuisance they keep up until they get time to get them in the yard; they wait for want of room, and sometimes they stop at the crossing ten or fifteen minutes."

Anna Boyle, when asked to state what she saw, said:

"Constant drilling, I think that is the main thing; we have a great deal more running regular trains than there used to be when Mr. and Mrs. Angel first came in the street, but the constant drilling in front of our houses and the dirt, for it seems to me continual, whether or not it is so, that they put their fuel in the locomotives and drilling out in order to set fire to it, to get it going,

Pennsylvania R. R. Co. *v.* Angel.

that is the way it appears from the smoke and dirt; he gets it more than we do, because sometimes I don't think they drill all the way up in front of my house, when they stop at that switch and drill back again, so they get more than I do, but the trouble and noise is almost equal, and the soot and dirt that constantly we get (I think constantly), that is when we get the southwest winds; the noise is fearful."

Emily Barber, who lives near, says:

"The road is used all the time; we have a constant noise and smoke from the drilling, and it is very annoying indeed; we are often obliged to close our house, and to keep it closed on account of the smoke and cinders."

She says she has frequently seen two, three, four and five engines between Second and Third streets. Speaking of cattle cars, she says:

"In the summer, they come up generally about half-past eight or nine; we have them then, for nearly three-quarters of an hour, drilling back and forth before they make up a train to go out; then they go out, they drill up, and then blow again; the same engine will come up again, bring up more, and go a little higher; generally, when they bring those cars up, we are obliged to close our house in summer, both the second and lower floors, because they stand there, and are very annoying; we had to close our house and keep the smell out; it filled the house, so that it would be so for quite a long time after they had gone; as to the noise, we are obliged of an evening to close our house if we have company; we close it and go back, if we wish to converse with our friends, because we cannot be heard."

She says that these things are daily occurrences. Thomas W. Megers saw three, four and five engines at the locality spoken of, "making a terrible noise and racket by blowing whistles." When asked what he meant by drilling, he said:

"I mean running up the engines and laying there; then another would run up in the neighborhood and lay there; so they would move back and forward and lay there; they remained there a few minutes, probably five or ten minutes; I have known freight trains to come there in the night carrying calves bleating, and lay there for some time; it would wake me up; once in a while, when I got in a good sound sleep, they would give a pretty hard blow with the engine, and the noise of the calves bleating; the smoke was a great annoyance—the smoke from the locomotives and from the freight trains."

Benjamin Richardson, speaking of what he saw and heard outside of the regular business of the road, said :

"They spent a great deal of time there on the tracks, that is the principal annoyance to us, when they stop there in front of our house the same as they would in front of these other houses ; they blow the whistle, and the men halloo and make a noise so you can't hear anything at all, particularly in summer time ; the noise by locomotives and trains laying in front of our house, and the bleating of the calves and sheep ; when a train is going through direct, I don't consider it so much of an annoyance, but it is those people standing there, those locomotives and cars when they stop there ; a long freight train makes a tremendous jar, each car coming together ; they make the same jar and noise in starting ; they may start and stop three or four times before they get away ; they remain there sometimes a few minutes and sometimes fifteen ; I suppose there are locomotives that have stood opposite my door half an hour every now and then, blow and ring the bells and go ahead a little piece, and then come back again."

Mr. McCall says :

"I am most annoyed by the freight trains drilling out and in, and the ringing of the bells ; the smoke also annoys me very much ; in the summer we have to shut our doors frequently ; when I was sick they would open the doors for me to get air, and we would have to shut them, or the gas from the smoke would choke me ; the stock and cattle in the middle of the night are very annoying."

His wife confirms him in these statements.

The only testimony offered to contradict or moderate the force of the foregoing is the following, by one of the employees of the road, who acts as train-master.    I transcribe from his statements :

" *Q.* Is there any use made of that track at all, except what is necessary for the proper transaction of your business ?

" *A.* No, sir ; we have endeavored to obviate that whenever possible ; we look to the interest of ourselves when the trains come in ; sometimes we can cut those trains in two or three pieces when they come down on the third track, but take such a day as to-day, I defy twenty-five men to cut a train and get it inside of the yard, when the wind is blowing right hard, and with a bad track, or something of the kind, it is very dangerous to undertake to do it, and it would be impossible ; you might put half a dozen men on the train, and it would make no difference to it ; oftentimes the engine don't give them sufficient

Pennsylvania R. R. Co. *v.* Angel.

start on the streets—may have too heavy a train or something to give them a start—and they run part way into the yard, and stand over Second street, and then we are obliged to take an engine and haul them back, and all that time it takes a little time to do it.

" *Q.* Are you in the habit of stopping freight cars on the track there between Second and Third streets, and permitting them to remain there indefinitely, or any length of time?

" *A.* No, sir; the only time trains are stopped on Third street is at a time when the yard is blocked, or we have some accident there, or something of that kind; sometimes the train comes in ahead of time a little, and our drill engine, which should take hold of that train or let it in, is down in the lower end of the yard, and the train has to stop; then the men have instructions to our crossings always; they have positive instructions whenever they come to a street, and can't get it down right away.

" *Q.* You do not permit them to stand, except in cases of accident in the yard, or of obstruction in there?

" *A.* Yes, sir; we never allow cars to stand there without the engine is fast to them; that is never allowed, of course; we don't use that as a side track or anything of that kind; as I said before, trains come down on this third track, and can't get down always at the moment.

" *Q.* Are you in the habit of permitting cars, loaded with cattle, hogs, sheep and swine, to remain upon the track there between Second and Third streets?

" *A.* No, sir; no longer than until we can possibly get them down in the yard after they come in the street.

" *Q.* Do the trains that come up from the West Jersey, and other roads there, ever have to be made up to send out to go east?

" *A.* Oh, yes; most all of that stuff comes up from the West Jersey road, or quite a large amount of it is transferred in Camden into other cars, and solid trains made out of it going to New York, Jersey City, Elizabeth, and all along the New York division of the Pennsylvania railroad.

" *Q.* How long are those trains that come in in that way kept standing there?

" *A.* Well, that would be a difficult thing to answer exactly; oftentimes they don't stand there at all, let right down as soon as they come in the street; sometimes they will stand there five, seven or ten minutes, just according to how we are fixed in the yard; they bring in, oftentimes, a large train of thirty-five or forty heavy-loaded cars; bring in two trains, one right after the other; I have known them to come thirty cars apiece; they can't both be let down in the yard the same time; one or the other of them has, necessarily, to stay there until it—it has got to be cut—until it gets through the switches at Second street; it has to be cut, and put away in pieces after the other one is let down.

" *Q.* Could you transact your business there in any other way than you do now, without the use of Bridge avenue?

" *A.* I do not see how it would be possible; we have studied that matter, and I know I have done my utmost for the last two or three years to make as

little delay as possible; I have been out there all kinds of times at night in reference to it."

My own judgment is that the smoke, dirt, cinders, noises and smells referred to by the witnesses work inconvenience, discomfort, hurt and damage to the complainants. They are not permitted to have anything like the same comfort and enjoyment in their home that they otherwise would. The value of their property, for a dwelling, is therefore greatly depreciated.

If these things be so, then what is generally denominated a nuisance exists in this case. If one of the complainants' neighbors were to engage in any vocation on an adjoining lot, and were to do and carry on any business, however legitimate in itself, which could only be carried on by making like noises and smoke and dirt, he certainly would be enjoined. Has the defendant any greater rights, or more extended, than an individual? I think not. I think the law is intended to operate alike upon all persons, artificial as well as natural. The defendant's franchise does not extend to doing damage of this character without compensation or restraint. It cannot say that "in the exercise of my franchise my business has grown so great that it becomes necessary for me so to use that franchise as to deprive the citizens who may chance to own land adjoining of the full and complete enjoyment of their homes." The butcher would not be permitted to say that his business is above the happiness of the citizen; nor would the tanner, or soap-boiler. I cannot understand that the legislature ever intended to authorize the defendant to commit a trespass or any other injury to any citizen. There is nothing in the charter to that effect, read it as you may. If such encroachments upon individual rights have not been included in the grant, then the same excuse (necessity from great prosperity) would justify such use of a street as to render houses uninhabitable. I cannot understand that the law is to be so interpreted, or that it ever has been so interpreted. I think that all judges have held that corporations cannot commit torts with immunity any more than individuals can. The law of necessity is of no more avail in the one case than in the other. The health,

Pennsylvania R. R. Co. v. Angel.

happiness and comfort of the individual in his home stands against all assaults, encroachments or innovations or necessities of a business nature.

And yet counsel for the defendant insists that the acts complained of are authorized by law, and therefore cannot be a nuisance, citing *Hinchman* v. *Paterson R. R. Co.*, *2 C. E. Gr. 75; Hogencamp* v. *Paterson Horse R. R. Co.*, *Id. 83.* I do not understand that the point before me was before the distinguished chancellor who decided those cases. A corporation of any sort can no more invoke these cases as a shield than can the butcher, soap-boiler or tallow-chandler. The business of each of these and all the like is perfectly legitimate, and stands on as firm a rock as any corporation can; but they cannot carry it on to the detriment of others. It may put the butcher to some inconvenience to erect his slaughter-pens outside of the city and drive his beeves there and cart his meat back into the city for sale, but the health, the comfort and enjoyment of the citizens require it, and the law compels him to go outside, or to abandon his trade.

Again, counsel insists that the defendant has used all proper care in the running of its trains, and, having shown that, it is exempt from all the consequences, citing *State* v. *Louisville and N. Albany and Mich. R. R. Co.*, *10 Am. & Eng. R. R. Cas. 286, 288; 2 Dill. on Mun. Corp.* § *701.* This insistment implies what is not warranted: that is, that the company is justified in using the tracks on Bridge avenue for the purposes complained of. It did not so use these tracks until very recently. So much of the work of the defendant in operating the road as is now complained of, until within six years, had always been done elsewhere. It is certainly much more reasonable to say that the defendant should continue to make up and distribute its trains elsewhere than to inflict the discomfort and injury upon the complainants, which the testimony shows it is doing daily.

The defendant also says that if the acts complained of be a nuisance, they are general, and extend to all the citizens of the community, and therefore that equity will not hear the complainants, since they have shown no special damage. It is true,

the complainants are not the only ones who are likely to be affected by the noises, smoke and dust complained of; but, from the testimony, I clearly infer that they extend to a very few indeed, and I infer, too, that they cannot be said to reach to and among the whole community. Besides, it seems plain that the complainant suffers the special damages contemplated by the cases in the books and by the text writers. I do not understand that the special damage must in every case be confined to one and only one individual.

I think these views are sustained by the cases of *Baltimore and Potomac R. R. Co.* v. *Fifth Baptist Church, 108 U. S. 317,* and *First Baptist Church* v. *Schenectady and Troy R. R. Co., 5 Barb. 79.*

I conclude that the complainants are entitled to the aid of this court. I will advise that an injunction do issue according to the prayer of the bill.

*Mr. P. L. Voorhees,* for appellants.

*Mr. J. W. Wartman* and *Mr. J. J. Crandall,* for respondents.

The opinion of the court was delivered by

DIXON, J.

The complainants are owners and occupants of a dwelling-house on the southerly side of Bridge avenue, between Second and Third streets, in the city of Camden. The defendant's tracks run through the central part of Bridge avenue in front of complainants' dwelling, across Second street, into its terminal yard, which extends from the westerly side of Second street to the Delaware river.

The bill avers that the defendant uses its tracks in front of the complainants' house for the purpose of distributing cars and making up trains in its freight and passenger business, and that it keeps locomotives and cars laden with live stock standing there, so that by reason of the stenches, noises, smoke, steam and dirt thereby occasioned, the comfort of the complainants'

home is seriously impaired, and hence they pray an injunction to restrain the defendant from continuing in that course of conduct.

The answer denies that the defendant uses its tracks in front of complainants' dwelling for the purpose of distributing cars and making up trains, and as a siding for cars, loaded with live stock or otherwise, and, generally, alleges that said tracks are used only in such modes as the proper transaction of its business necessitates.

The evidence is clear that the tracks mentioned are continually used in the manner set out in the bill. The defendant's trainmaster, at Camden, testifying for the company, states that the company uses Bridge avenue above Second street considerably for the purpose of drilling, and that he could not transact the company's business without doing so ; that he is not in the habit of permitting cars loaded with cattle, sheep and swine to remain upon the track between Second and Third streets longer than he must, before getting them down into the yard after they come into the street. These occurrences take place at various hours of the day and up to eleven o'clock at night; ordinarily, he says, not later than that time. The proofs presented by the complainants, and not controverted on behalf of the defendant, establish that the use of the tracks thus admitted results in the nuisances of which complaint is made.

The fact that these nuisances are continuous, and materially diminish the comfort of complainants in their residence, makes the case one proper for an equitable remedy by injunction, unless the defendant can justify its conduct. *Ross* v. *Butler, 4 C. E. Gr. 294,* and cases there cited.

The defendant's justification was rested, at the argument, upon the ground that the legislature and the common council of Camden had authorized the defendant to use Bridge avenue for its business, that its business requires such use as the defendant has hitherto made, and therefore the use cannot be, in a legal sense, injurious.

There are two sufficient answers to this claim.

The first is that neither the legislature nor the common council has attempted to grant so extensive a privilege as is here set

up.   The charter of the Camden and Amboy Railroad Company, passed February 4th, 1830, authorized it to construct and operate a railroad, with all necessary appendages, within limits embracing the locality now under consideration.   In 1834 the Camden common council, by resolution, authorized that company to use Bridge avenue for the purposes of its roadway.   In 1855 the legislature (*P. L. of 1855 p. 118; Rev. p. 919 § 65*) authorized railroad companies, whose incorporating acts limited the quantity of land which they might hold at their stations, to purchase and hold so much land as might be strictly necessary for most conveniently storing and working upon their engines, cars, fuel and materials to be used ·on their roads, and for receiving and delivering property transported on their roads to the best advantage, and for tracks, wagon-roads, platforms, and all other strictly station and railroad purposes.   In 1862 the city council, by " an ordinance to afford facilities to the Camden and Amboy Railroad Company for the running òf their trains through the city of Camden," gave its consent and authority to the company to lay side tracks, running obliquely from a point on the railroad, along Bridge avenue, between Second and Third streets, to and upon the company's depot property lying west of Second street.   From these laws and regulations arise whatever rights the defendant, which is the lessee of the Camden and Amboy Railroad Company, appears to have in Bridge avenue, in front of complainants' house.   In our judgment, they indicate that those rights are such as pertain to the use of the avenue for the purposes of a way, not for the purposes of a station-yard.   The primary privilege given is that of passage; this and its reasonable incidents cover the whole scope of the grant.   The right of storing engines and cars, either for a longer or a shorter period, the right of making up or breaking up trains, are not embraced in such a concession.   These are strictly station and terminal purposes, and by providing for station-yards the legislature has indicated its intention that business of that nature should be transacted there.   We do not say that the company may not, under any circumstances, do upon its roadway what ought commonly to be done in its yards; for, no doubt, unforseen occurrences may some-

times render such acts almost indispensable, and then other less urgent rights, of the public at least, must give way. But when, in the ordinary course of its business, the company devotes a portion of its roadway to station purposes, it goes beyond express legislative sanction, and can support itself, if at all, only as a private individual might. This is what the defendant did in Bridge avenue. Having a right of passage there, it used its tracks as though they were within its terminal yard, and so used them constantly in its every-day concerns. For this there is no legislative or municipal authority.

But, secondly, an act of the legislature cannot confer upon individuals or private corporations, acting primarily for their own profit, although for public benefit as well, any right to deprive persons of the ordinary enjoyment of their property, except upon condition that just compensation be first made to the owners. This principle rests upon the express terms of the constitution. In declaring that private property shall not be taken without recompense, that instrument secures to owners, not only the possession of property, but also those rights which render possession valuable. Whether you flood the farmer's fields so that they cannot be cultivated, or pollute the bleacher's stream so that his fabrics are stained, or fill one's dwelling with smells and noise so that it cannot be occupied in comfort, you equally take away the owner's property. In neither instance has the owner any less of material things than he had before, but in each case the utility of his property has been impaired by a direct invasion of the bounds of his private dominion. This is the taking of his property in a constitutional sense; of course, mere statutory authority will not avail for such an interference with private property. This doctrine has been frequently enforced in our courts. In *Trenton Water Power Co.* v. *Raff, 7 Vr. 335*, Mr. Justice Depue said: " The destruction of private property, either total or partial, or the diminution of its value by an act of the government directly, and not merely incidentally affecting it, which deprives the owner of the ordinary use of it, is a taking within the meaning of the constitutional provision. * * * The injuries to which immunity from responsibility

.attaches are such only as arise incidentally from acts done under a valid act of the legislature, in the execution of a public trust for the public benefit, by persons acting with due skill and caution within the scope of their authority. If the injury be direct, or the work be done for the benefit of an individual or corporation, with private capital and for private emolument, the principle which absolves the parties from liability to action at the suit of persons injured does not apply, even though the public be incidentally benefitted by the improvement." He cites several decisions in this state supporting the doctrine. In *McAndrews* v. *Collerd, 13 Vr. 189,* the chancellor declared, as the opinion of this court, that the proposition that the legislative authority to a private corporation or an individual to do a work for its or his own profit, includes authority to use, at whatever hazard to the persons or property of others, dangerous materials, provided they be necessary to the convenient prosecution of the work, cannot be sustained; that there is an obvious distinction between the liability of a private corporation to public prosecution for a legalized nuisance, and its liability to a private action for damages arising from such nuisance; that in the one case the legislative authority is a protection, and in the other it is not. To the same effect is the language of the supreme court of the United States in *Baltimore and Potomac Railroad Co.* v. *Fifth Baptist Church, 108 U. S. 317 :* "The acts that a legislature may authorize, which, without such authorization, would constitute nuisances, are those which affect public highways or public streams, or matters in which the public have an interest, and over which the public have control. The legislative authority exempts only from liability to suits, civil or criminal, at the instance of the state; it does not affect any claim of a private citizen for damages for any special inconvenience and discomfort not experienced by the public at large."

It must not be gathered from these propositions that all those inconveniences, which are the necessary concomitants of the location of railroads in populous neighborhoods, are to be considered civil injuries. That railways shall be so constructed and operated is required by the unanimous consent of the com-

Pennsylvania R. R. Co. v. Angel.

munity, and the annoyances thence unavoidably arising are not of sufficient importance to be regarded as invasions of those rights of property which society recognizes and protects. They must be classed rather among those limitations which the social state imposes upon the enjoyment of private. property for the common good. But if in any case these annoyances become so great as to destroy or substantially impair the legitimate use of private property, the person injured becomes entitled to redress. Even the common good must then yield to private right, unless compensation be made.

The decree and injunction below, following the prayer of the bill, are therefore, in the main, correct, but perhaps they may be interpreted as going further than they should, in that they absolutely forbid, under any circumstances, the use of defendant's tracks in front of complainants' premises for the purpose of distributing and shifting cars and making up trains, and putting and placing thereon cars laden with cattle, sheep and hogs. Such a use may, sometimes, in extraordinary emergencies, be unavoidable, and if it then should occasion a material injury to complainants, should be paid for in damages rather than be prohibited by injunction. The injunction should be against the use of those tracks, for the purposes indicated, in the transaction of the ordinary business of the defendant, leaving it at liberty to show, in response to any attempt to punish it for violation, that an occasional use was necessitated by an unforeseen contingency.

In order to make this modification, the decree below should be reversed, but without costs to the appellant. The complainants should recover their costs in the court below.

*Decree unanimously reversed.*