152 N.J. Super. 391 (1977)
377 A.2d 1244
GERRIT J. VAN DISSEL, PLAINTIFF,
v.
JERSEY CENTRAL POWER & LIGHT COMPANY, A CORPORATION OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided July 22, 1977.
*394 Mr. Alan R. Hoffman, of the Massachusetts Bar, for plaintiff (Messrs. Friedman and Greb and Messrs. Kaplan, Latti and Flannery of the Massachusetts Bar, attorneys; Mr. Eugene M. Friedman and Mr. Hoffman on the brief).
*395 Mr. Clarence P. Reberkenny for defendant (Messrs. Hyland, Davis & Reberkenny, attorneys; Mr. John S. Fields and Mr. Reberkenny, of counsel and on the brief).
STEIN, J.C.C., Temporarily Assigned.
Defendant Jersey Central Power & Light Company (Jersey Central) moves to dismiss the complaint in this action for lack of jurisdiction over the subject matter. See R. 4:6-2(a). It contends that consideration of any and all aspects of plaintiff's suit, which concerns itself with the effects of the operation of Jersey Central's nuclear power plant at Oyster Creek in Lacey Township, Ocean County, is barred by the doctrine of federal preemption.
Construction and operation of this same power plant, and the legal ramifications thereof, have already been reviewed at length in State v. Jersey Central Power & Light Co., 69 N.J. 102 (1976).
Two novel questions are presented by this motion:
1. Does the doctrine of federal preemption bar a private plaintiff from pressing tort claims for damages to his property allegedly arising from the governmentally-approved operation of defendant's nuclear power plant?
2. If such relief is not available to plaintiff, can he seek damages for any asserted diminution in the market value of his property under the theory of inverse condemnation?
Plaintiff brings this class action on his own behalf and on behalf of all riparian property owners claimed to have an interest in property located on Forked River, Oyster Creek, Barnegat Bay and various lagoons, canals and inlets which are tributaries of those waterways. Defendant Jersey Central is a public utility of the State of New Jersey organized and existing pursuant to N.J.S.A. 48:1-1 et seq.
Upon timely motion by defendant, this court first considered the question of whether this action should properly be maintained as a class action; whether there were questions of law and fact common to the claimed class, as well *396 as whether the claimed class should be divided into subclasses for the purposes of this litigation. See, generally, R. 4:32-1 and R. 4:32-2(d). In addition to the moving and answering papers, the court has had the benefit of oral testimony from an expert witness produced by plaintiff who testified at considerable length on such matters as the operation of defendant's nuclear power reactor plant and the cause of certain conditions which, it is contended, caused damage to the property of plaintiff and those in his claimed class.
During the course of these hearings it became increasingly apparent that this court might not have subject matter jurisdiction over all or part of the claims made against this defendant by plaintiff. Accordingly, defendant moved to dismiss all of plaintiff's claims because of lack of jurisdiction over the subject matter, pursuant to R. 4:6-2(a). As stated above, defendant relies on the doctrine of federal preemption. See State v. Jersey Central Power & Light Co., supra.
The gravamen of plaintiff's multi-count complaint is that his property, more specifically his dock and other structures and appurtenances which abut or extend into one of the above listed waterways, have been injured by the operation of Jersey Central's nuclear power plant located between Oyster Creek and Forked River in Lacey Township. This damage allegedly arose from the infestation of "shipworms" into these various waterways. It is claimed that the "worms" burrow into wooden structures and eventually cause their destruction by eating away the wood. It is further asserted that this infestation of shipworms was and is caused by the operation of Jersey Central's nuclear power plant.
Plaintiff's complaint requests money damages and, additionally, seeks to enjoin defendant from further operation of its power plant "in a manner which will cause damage to plaintiff and other members" of his class. For reasons more fully set forth herein, it is obvious that if plaintiff is barred *397 from a money damage claim because of federal preemption, then injunctive relief will also be barred.[1]
Shipworms, members of the phyllum mollusk, are a type of clam. Plaintiff alleges that defendant's nuclear plant has caused an infestation of shipworms indigenous to the area in which plaintiff and members of his claimed class own property, and this increased as well the area in which that type of shipworms live. Further, it is asserted that the breeding period of two species of the native genus of shipworms  teredo navalis and bankia gouldi  has been extended. Plaintiff also claims that two subtropical species of the genus of shipworms  teredo pfurcifera and teredo bartschi  are now found in large numbers in the area. These subtropical species are not indigenous to the Barnegat Bay area. Plaintiff asserts that the proliferation of the subtropical species of shipworms was also caused by the operation of defendant's nuclear plant.
Three elements are needed for the various types of shipworms to thrive: wood, sufficiently warm water temperature and a sufficient amount of water salinity.
Defendant's nuclear power plant utilizes a once-through cooling system to cool the steam produced by the defendant's condenser. Water used for this system is brought from the south branch of Forked River and is discharged into Oyster Creek. When water is drawn from the south branch of Forked River, this causes a partial reversal of the normal flow of the river. Through a suction-type operation, saline water is drawn from Barnegat Bay to Forked River, thereby making part of the river saline instead of its natural fresh water state.
Since the various types of shipworms cannot survive in fresh water, it is alleged that the operation of defendant's plant has caused an increased area in which shipworms may *398 survive, thrive and proliferate. Additionally, discharge of saline water into Oyster Creek has changed that waterway from fresh to salt water. Further, it is alleged that the discharged water becomes hotter when it cools the condenser of the plant. Plaintiff claims that this discharge of heated water circulates and causes an increase in the water temperatures in the waterways on which he and his claimed class own property. This increased temperature permits indigenous shipworms to have a longer breeding period and to have a lower mortality rate during the winter months. The elevated temperature also permits the subtropical species, not indigenous to the area, to survive and proliferate. In brief, it is alleged that the operation of defendant's nuclear power plant causes, extends and creates an environment in which shipworms thrive.
This once-through cooling system of Jersey Central's nuclear plant also serves as part of the defendant's radioactive waste ("radwaste") discharge system. The radwaste discharge system collects, processes, stores and reclaims or disposes of all liquids that may contain certain radioactive material. The purpose of the radwaste system is to reduce the radioactive contents in liquid effluents and to reclaim higher purity water for reuse in the plant system. The radwaste discharge system is "piggybacked" onto the once-through cooling system. This once-through cooling system thereby functions to dilute the radwaste discharge.
Plaintiff alleges claims based upon various theories of liability, including negligence, nuisance, strict liability in tort, inverse condemnation and violations of various state and federal statutes. Relying on the recent decision of our Supreme Court in State v. Jersey Central Power & Light Co., supra, defendant asserts that this court lacks subject matter jurisdiction over any and all aspects of this case.
Because of the differing theories upon which plaintiff relies, there will first be considered the tort claims of plaintiff and then, as a separate matter, the claim of inverse condemnation.

*399 The Tort Claims
In State v. Jersey Central Power & Light Co., supra, the State through the Department of Environmental Protection, brought suit against Jersey Central for penalties and damages arising from the deaths of a large number of menhaden fish. The State contended that these deaths resulted from the sudden flow of cold water into Oyster Creek after a temporary shutdown of the same nuclear power plant which is the subject matter of this litigation. While holding that the State had not proved the existence of proximate cause, the Supreme Court additionally held that "a finding of nonliability for Jersey Central is also dictated by federal preemption." 69 N.J. at 111. The court further noted:
* * * Application of N.J.S.A. 23:5-28 and the assertion of damages by the State either as parens patriae or public trustee are not permissible under the circumstances because of infringement upon and conflict with a subject matter over which Congress has vested exclusive jurisdiction in the AEC. [Id.]
The court then concluded that the State may not directly or indirectly interfere with this federally preempted area of regulation. Regulation by the State is restricted to "activities for purposes other than a protection against radiation hazards." 69 N.J. at 112; see 42 U.S.C.A. § 2021(k).[2]
Plaintiff advances a two-pronged argument in an effort to distinguish Jersey Central. First, he claims that a suit seeking damages arising from a normal operation of the once-through cooling and discharge system is not "regulation" by *400 the State for the purpose of protection against radiation hazards. Plaintiff asserts that if a suit seeking such relief can be construed as "state regulation," all that such litigation attempts to "regulate" is the temperature and salinity of the discharge water. However, such a contention overlooks the fact that the radwaste discharge system is "piggybacked" onto the once-through cooling system. Thus, if one system is regulated, the other system is similarly regulated. The radwaste discharge system cannot be regulated by the State because it is clearly designed and utilized as part and parcel of the system installed  with federal approval  to protect against radiation hazards. See 42 U.S.C.A. § 2021(k). Regulation of this once-through cooling system, which is so integrally tied to the radwaste discharge system, is at least an indirect regulation of the radwaste discharge system. Interference with such regulation is clearly impermissible under State v. Jersey Central Power & Light Co., supra.[3] See, also, Northern States Power Co. v. Minnesota, 447 F.2d 1143 (8th Cir.1971), aff'd mem. 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972).
The second basis upon which plaintiff moves to avoid the preemption doctrine is that the Atomic Energy Act of 1954, as amended (42 U.S.C.A. § 2011 et seq.) did not preempt private citizens from maintaining traditional common law remedies against the licensee, Jersey Central. To support its position, plaintiff relies upon Marshall v. Consumers Power *401 Co., 65 Mich. App. 237, 237 N.W.2d 266 (Ct. App. 1975), as well as the legislative history of that act.
In Marshall an individual plaintiff brought suit against the power company seeking a declaratory judgment that defendant's proposed power plant would constitute either a public or a private nuisance. The Michigan intermediate appellate court held that the suit was premature because at that time it was unclear as to when, if at all, and under what conditions the plant could be built. 237 N.W.2d at 283-284. The factual basis of the nuisance complained of was that the cooling pond of the power plant caused accumulation of ice during the winter on plaintiff's property, and that fogging and icy conditions would make driving hazardous during the winter. The court held that it was not preempted from considering those issues as they were founded on a common law nuisance theory. 237 N.W.2d at 275. There is no indication that any radwaste discharge system was "piggybacked" on the cooling pond as in this case. In short, the Marshall court was careful to point out that it was not dealing with radiological hazards from the plant. 237 N.W.2d at 275, 276-277. Thus, it is clear that the court in Marshall would have considered damage claims arising from radiological hazards, including radioactive waste releases, to have been preempted. See 237 N.W.2d at 277-278.
Marshall is of no assistance to plaintiff. Here, unlike in that case, plaintiff's claim is based upon damages from the operation of that portion of Jersey Central's plant which is designed to protect against hazards arising from the emission of radioactive waste.
In any event, to the extent that Marshall is inconsistent with Jersey Central, our Supreme Court's decision is obviously binding on this court.
Plaintiff further argues that Congress did not intend to preempt private individuals from asserting common law claims against licensees of the Atomic Energy Commission (now the National Regulatory Commission). He points to *402 the legislative history of the 1957 Price-Anderson Amendment to the Atomic Energy Act, as subsequently amended.
This amendment, in current form, requires the United States to be an indemnitor for reactor operators up to a certain sum when damage results from a "nuclear incident." 42 U.S.C.A. § 2210; see also, 1957 U.S. Code Cong. & Admin. News, at 1816. For the legislative history of subsequent amendments to the Price-Anderson Amendment, see 1966 U.S. Code Cong. & Admin. News, at 3206-3209; 1964 U.S. Code Cong. & Admin. News, at 2662; 1962 U.S. Code Cong. & Admin. News, at 2215-2216.
The obvious intent of the Price-Anderson Amendment and its subsequent amendments was to protect the public from a nuclear incident. The federal courts are vested with original, but not exclusive, jurisdiction to entertain such claims. 42 U.S.C.A. § 2210(o). The term "nuclear incident" is defined by the statute as
* * * [A]ny occurrence * * * within the United States causing * * * damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or by-product material * * *. [42 U.S.C.A. § 2014(q), as amended, 89 Stat. 1111, Pub. L. 94-197 (1975)]
Plaintiff's claimed injury or damage does not arise out of or result from the radioactive property contained in the radwaste discharge system. The increased temperature and salinity was not caused by those properties inherent in the radwaste discharge. Cf. State v. Jersey Central Power & Light Co., supra, 69 N.J. at 110. Application of the Price-Anderson Amendment is inappropriate to this case.
Plaintiff additionally argues that the history of the Price-Anderson Amendment indicates that Congress did not intend to preempt the whole field of tort liability relating to atomic power. However, it is clear that Congress did intend to preempt state control of activities in matter relating to protection against radiation hazards. 42 U.S.C.A. *403 § 2021(k); State v. Jersey Central Power & Light Co., Northern States Power Co. v. Minnesota and Marshall v. Consumers Power Co., all supra. From this entire field preempted by Congress, state courts have been granted concurrent jurisdiction to hear only those private cases arising from nuclear incidents. This case does not arise from a "nuclear incident" under 42 U.S.C.A. § 2014(q) as amended.
Any doubt about this question is put to rest by what our Supreme Court said in State v. Jersey Central Power & Light Co., supra:
* * * The cessation of the plant's functioning, emission of radioactive waste and dilution of that waste (obviously to protect against radiation hazards) were requirements included in the license. Interference by the State, whether by statutory penalty, injunction or monetary damages, with these facets of nuclear power generation, regulation of which has been vested exclusively with the AEC, is not permissible. [69 N.J. at 115; footnote omitted].
Plaintiff's attempts to seek money damages through the vehicle of tort claims constitute at least an indirect interference with the defendant's radwaste discharge system. Such state interference is impermissible. This court lacks subject matter jurisdiction over all of plaintiff's claims based upon tort liability and statutory violations. Defendant Jersey Central's motion to dismiss those counts relating to such claims is granted.

The Inverse Condemnation Claim
Different factors govern consideration of plaintiff's claim for recovery of damages on the theory of inverse condemnation.[4]
*404 Inverse condemnation is a method of taking private property under the power of eminent domain by either the sovereign or by another clothed with the sovereign's power. Such taking does not occur in compliance with statutorily imposed procedures. The essence of the cause of action is a de facto taking of private property under the power of eminent domain. 3 Nichols, Eminent Domain (3 ed. 1976), § 8.1 [4]. Inverse condemnation is a remedy designed to protect the public and to assure that the landowner, whose property was taken de facto, receives just compensation. Inverse condemnation is not designed to protect the wrongdoing or taking utility. Harris v. L.P. & H. Constr. Co., 441 S.W.2d 377, 381 (Mo. Ct. App. 1969). See also, Petition of American Tel. & Tel. Co., 128 N.J. Super. 238, 244 (App. Div. 1974).
Both the United States and the New Jersey Constitutions prohibit the taking of private property without just compensation. N.J. Const. (1947), Art. I, ¶ 20; Art. IV, § VI, ¶ 3; U.S. Const., Amends. V, XIV; Washington Market Enterprises v. Trenton, 68 N.J. 107, 116 (1975).[5]
The Due Process Clause of the Fourteenth Amendment requires just compensation to the owner when a state or its agency takes that individual's property. Chicago, Burlington & Quincy R.R. Co. v. Chicago, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897).
*405 In other cases it has been held that while Congress may preempt a field, a suit for inverse condemnation is nonetheless maintainable in a state court. If a de facto taking has occurred, the property owner so deprived is not barred from the doors of the state courthouse because of federal preemption.
A notable example of the right to maintain an inverse condemnation action in the face of federal preemption are those cases dealing with regulation of airport noise  a field completely foreclosed from state regulation by federal legislation. City of Burbank v. Lockheed Air Terminal, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973). Prior to the Burbank decision a New Jersey trial court had limited the hours during which jet aircraft could utilize extended runways of Morristown Airport, thereby regulating jet aircraft noise. Subsequent to Burbank the Appellate Division affirmed the dissolution of restraints concerning time limitations on aircraft taking off in Hanover Tp. v. Morristown, 135 N.J. Super. 529 (App. Div. 1975). The court noted:
Furthermore, we find no merit in plaintiffs' claim that the vacation of the restrictions on the use of the airport * * * deprived them of their remedy for the alleged wrong resulting from the intolerable noise produced by the increased use of the airport without due process. Although the Federal Government has preempted the field of aircraft noise, neither plaintiff municipalities nor the individual plaintiffs are without remedies. Both can take appropriate action before the Environmental Protection Agency and the Administrator of the Federal Aeronautical Act, and the individual plaintiffs, as landowners, may in a proper case have actions at law against the Morristown Airport Commission as the operator of the airport on the theory of inverse condemnation. See Griggs v. Allegheny County, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585, 588-589 (1962); Village of Bensenville v. City of Chicago [16 Ill. App.3d 733, 306 N.E.2d [562], 566 (1973)] [at 535; emphasis added]
It is clear, then, that federal preemption will not bar a suit for inverse condemnation in a state court. Defendant's motion to dismiss the complaint because of lack of *406 jurisdiction over the subject matter is denied as to plaintiff's count alleging a taking through inverse condemnation.
The inquiry is not ended. Jersey Central has raised questions as to whether the facts support a claim for inverse condemnation and whether this defendant has the power of eminent domain under these facts. Both parties have had an opportunity to submit briefs and affidavits on this issue. As was noted previously, oral testimony was also taken. Since matters outside the pleadings have been considered, this court will treat these contentions of this defendant as a motion for summary judgment. See R. 4:6-2; Passaic Jr. Chamber of Commerce v. Passaic Housing Auth., 45 N.J. Super. 381, 385 (App. Div. 1957); Raskulinecz v. Raskulinecz, 141 N.J. Super. 148, 154 (Law Div. 1976).
The provisions of both the New Jersey and United States Constitutions are "taking" provisions. They are not "taking or damage" provisions. Washington Market Enterprises v. Trenton, supra, 68 N.J. at 116; Morristown Bd. of Ed. v. Palmer, 88 N.J. Super. 378, 385-386 (App. Div. 1965), rev'd on other grounds 46 N.J. 522 (1966). Both Constitutions require a taking as prerequisite to the payment of just compensation. Conversely, if there has been no taking, any loss to the property owner is a noncompensable governmental exercise of the police power. Washington Market Enterprises v. Trenton, supra at 116. Both the New Jersey and the United States constitutional provisions are limitations upon the sovereign's inherent power to condemn. United States v. Jones, 109 U.S. 513, 3 S.Ct. 346, 27 L.Ed. 1015 (1883); State v. Lanza, 27 N.J. 516, 530 (1958), app. dism. 358 U.S. 333, 79 S.Ct. 351, 3 L.Ed.2d 350 (1959).
The critical issue to be resolved on this motion is whether the alleged damage and destruction to plaintiff's property caused by the infestation of shipworms is a "taking" in the constitutional sense. If it is a taking, then the Atomic Energy Act, with its wide sweep of preemption, cannot preclude plaintiff's suit. To construe the act *407 otherwise would place the act in direct conflict with both the federal and New Jersey Constitutions. Cf. Griggs v. County of Allegheny, 369 U.S. 84, 89-90, 82 S.Ct. 531, 533-534, 7 L.Ed.2d 585, 588-589 (1962); United States v. Causby, 328 U.S. 256, 261-262, 66 S.Ct. 1062, 1065-1066, 90 L.Ed. 1206, 1210 (1945).
It has long been held that the physical invasion of matter onto the property of another can constitute a taking. Indeed, as Washington Market Enterprises points out, rare has been the occasion where despite physical invasion no taking was found to have occurred. 68 N.J. at 117-118. As one eminent authority notes:
* * * The more common case of constructive taking, however, is by invasion of matter, and it is well settled that when land is devoted to the public use under legislative authority in such a manner as to cause neighboring land to be invaded by such quantities of matter as effectually to destroy its usefulness, there is a taking of the land so invaded. [3 Nichols, Eminent Domain (3d ed. 1970) § 6.23 at 6-54.]
Invasion of earth, sewerage and water have been held to constitute takings. 3 Nichols, Eminent Domain at § 6.23 (1), (2) and (3). The physical invasion standard is still a method of determining whether or not a taking has occurred. Washington Market Enterprises v. Trenton, supra, 68 N.J. at 117.
In Trenton Water Power Co. v. Raff, 36 N.J.L. 335 (Sup. Ct. 1873), plaintiff was permitted to recover damages to his property arising from the inundation of water onto his land because of construction of a dam built by a water power company pursuant to an act of the Pennsylvania legislature.
In Pennsylvania R.R. Co. v. Angel, 41 N.J. Eq. 316 (E. & A. 1886), the court said in dictum:
* * * Whether you flood the farmer's fields so that they cannot be cultivated, or pollute the bleacher's stream so that his fabrics are stained, or fill one's dwelling with smells and noise so that it *408 cannot be occupied in comfort, you equally take away the owner's property. In neither instance has the owner any less of material things than he had before, but in each case the utility of his property has been impaired by a direct invasion of the bounds of his private dominion. This is the taking of his property in a constitutional sense; of course, mere statutory authority will not avail for such an interference with private property. This doctrine has been frequently enforced in our courts. * * * [at 329]
The United States Supreme Court has also utilized the physical invasion standard to determine whether certain acts constitute a taking. In Pumpelly v. Green Bay & Mississippi Canal Co., 13 Wall. 166, 80 U.S. 166, 20 L.Ed. 557 (1872), defendant, pursuant to statutory authority, constructed a dam which caused water to overflow and remain continuously on plaintiff's land. The court held that this was a taking within the meaning of the Wisconsin Constitution. The court stated:
* * * [W]here real estate is actually invaded by superinduced additions of water, earth, sand or other material, or by having any artificial structure placed on it, so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the Constitution, and that this proposition is not in conflict with the weight of judicial authority in this country, and certainly not with sound principle. Beyond this we do not go, and this case calls us to go no further. [80 U.S. at 181, 20 L.Ed. at 561]
In United States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1916), plaintiff's land was partially inundated by water from a dam constructed by the United States. The Court held that the partial overflow onto plaintiff's land was a taking in the constitutional sense. The court stated that "[i]t is the character of the invasion, not the amount of damage resulting from it, so long as the damage is substantial, that determines the question of whether it is a taking." 243 U.S. at 328, 37 S.Ct. at 385, 61 L.Ed. at 753.
In United States v. Causby, supra, the court was faced with the question of whether plaintiff's property, a chicken farm, was taken because of regular and frequent military flights over plaintiff's land at low levels. The court noted *409 that "flights over private land are not a taking unless they are so low and so frequent to be a direct and immediate interference with the enjoyment and use of the land." 328 U.S. at 266, 66 S.Ct. at 1068, 90 L.Ed. at 1213.
Courts in other states have held that a cause of action exists for inverse condemnation on similar fact patterns.
In Tamulion v. Michigan State Waterways Comm'n, 50 Mich. App. 60, 212 N.W.2d 828 (Ct. App. 1973), plaintiff owned a lot and small cottage on Lake Superior. A small craft harbor was constructed adjoining plaintiff's property by the state authority and the United States Army Corps of Engineers. Erosion threatened the harbor. Both the federal and state agencies, with plaintiff's agreement, did "remedial work" to prevent destruction of this harbor by erosion. Much to plaintiff's surprise and undoubted chagrin, the "remedial work" consisted of the addition of 80 feet of jagged rocks onto plaintiff's property. Despite these "remedial efforts" erosion continued unabated. The court held that this destruction of the utility of plaintiff's property and the continued erosion caused by construction of the small craft harbor was a "taking" under both the Michigan and federal Constitutions. 212 N.W.2d at 831.
In Mehl v. People ex rel. Dep't of Public Works, 13 Cal.3d 710, 119 Cal. Rptr. 625, 532 P.2d 489 (Sup. Ct. 1975), a drainage ditch was constructed under a highway by defendant.[6] This ditch was connected to a natural drainage swale on plaintiff's property and the defendant condemned this swale. Plaintiff claimed that an additional taking had occurred because the highway construction directed more drainage flow onto the remainder of plaintiff's property at a higher speed and in a more concentrated location. The *410 California Supreme Court held that the evidence supported a finding of a taking of the property as a consequence of this highway construction.
If plaintiff's theory is proved, operation by Jersey Central of its Oyster Creek plant is a proximate cause of the invasion of plaintiff's property by shipworms. Plaintiff's claim is that he and members of his class have suffered both actual destruction of piers, docks and summer homes, and, in the very least, have sustained destruction of the utility thereof. If such claims can be supported by proofs at the time of trial, then such destruction would necessarily be substantial. This would constitute a direct and immediate interference with the use and enjoyment of property by plaintiff and the members of his claimed class, by virtue of the physical invasion of this property. Plaintiff has thus stated a claim against defendant Jersey Central for damages on the theory of inverse condemnation.
This court must, of course, follow the view that it is the deprivation of the owner rather than the accretion of a right or interest to the sovereign that constitutes the taking. United States v. General Motors Corp., 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311, 318 (1945); Morristown Bd. of Ed. v. Palmer, supra, 88 N.J. Super. at 386.
Defendant's motion for summary judgment on the ground that the operation of its plant constitutes no taking must be denied.[7]
Jersey Central claims that even if there has been a taking in the constitutional sense, there can be no claim for inverse condemnation because the appropriate statutory condemnation procedures were not followed. Additionally, Jersey Central maintains that it is not clothed with the power of eminent domain for this type of taking.
*411 The first contention is obviously without merit. Statutory safeguards were enacted to protect the private interest from abuse in the exercise of eminent domain by the public utility. Jersey Central cannot hide behind the protection of these statutory procedures. These procedures were enacted to protect the property owner  not the public utility. Petition in American Tel. & Tel. Co., 128 N.J. Super. 238, 244 (App. Div. 1974).
Worthy of consideration is this defendant's contention that no statute confers upon it the power of eminent domain for the type of taking of which this plaintiff complains. See Game & Fish Comm'n v. Farmers Irrigation Co., 162 Colo. 301, 310, 426 P. 2d 562, 566 (1967), in which the Colorado Supreme Court held:
Where there is no power on the part of a state agency to condemn private property for a claimed public use, a property owner whose property has been damaged by such agency cannot be held to have commenced an action for "inverse condemnation" when he seeks to recover the damages actually sustained by him. There can be no "inverse condemnation" in a situation where no right exists in a governmental agency to proceed under eminent domain. [426 P.2d at 566; emphasis added]
To the same effect, see Garver v. Public Service Co. of New Mexico, 77 N.M. 262, 421 P.2d 788 (Sup. Ct. 1966).
If Jersey Central does not have eminent domain power in the instant case, then it cannot acquire title in any manner to plaintiff's property, nor can plaintiff be reimbursed for any damage for such a taking. Plaintiff and members of his class would then be left with a host of theoretical claims based upon such theories as trespass and nuisance. Such claims would, of course, be precluded by the doctrine of federal preemption. If Jersey Central cannot condemn plaintiff's property, plaintiff would be left remediless.
Jersey Central is too modest in its analysis of its vast statutory power of eminent domain. This utility is empowered to acquire through eminent domain such property as is reasonably necessary for its statutory purposes. N.J. *412 S.A. 48:3-17.6. It may also acquire other instrumentalities and property necessary or desirable for the purposes of generating heat, electricity, power or light. N.J.S.A. 48:7-7. Further, Jersey Central may acquire such property which may be required for the construction of facilities necessary to carefully use its statutory purposes. N.J.S.A. 48:7-8.
It is clear that the Legislature of this State gave to this public utility a very broad power of eminent domain.
The method by which Jersey Central operates its nuclear plant at Oyster Creek is "reasonable" and the method it has chosen has been reviewed and approved by appropriate governmental regulatory bodies. The licensing procedure concerning the Oyster Creek plant is set forth in detail in State v. Jersey Central Power & Light Co., supra, and there is no need to iterate the history of how this facility came into being. Suffice to say that the construction and operation of this plan is reasonable. If it is true that Jersey Central has taken property of plaintiff and his claimed class in the manner asserted by plaintiff, then of necessity such a taking must be construed as reasonably necessary for the operation of defendant's Oyster Creek nuclear power plant. Since defendant does have this power of eminent domain, defendant's motion for summary judgment based upon the claim of lack of statutory taking power must be denied.
Defendant's motion to dismiss the complaint for lack of subject matter jurisdiction is granted as to all claims except that based on the theory of inverse condemnation. This court has subject matter jurisdiction over plaintiff's inverse condemnation claim. Defendant's motion for summary judgment on the ground that there has been no taking, and on the additional ground that this defendant utility does not have the power of eminent domain under these alleged facts, is also denied.
There remains one matter for immediate consideration. All of the properties claimed to be affected by operation of defendant's plant are located in Ocean County. It is obvious that the venue in this case has been improperly *413 laid in Morris County. R. 4:3-2(a)(1). Despite persistent but gentle prodding by this court, the parties to this litigation have continued to display continued reluctance to remove this case to its appropriate place of venue. For appropriate consideration of the matter of venue, a copy of this opinion will be forwarded to the assignment judge of the Morris, Sussex and Warren vicinage.
NOTES
[1] It should be noted that while plaintiff seeks ultimate injunctive relief, no such interim request has yet been made by plaintiff pending the outcome of this litigation.
[2] In these preliminary proofs before the court, plaintiff has prima facie demonstrated that the operation of Jersey Central's plant is a proximate cause of his damage and injury. In the Jersey Central decision the shutting down of the plant which resulted in the flow of cold water was held not to be the proximate cause because the surrounding waterways were returned to their natural state. In this case operation of the plant is claimed to have altered the natural state of the waterways by increasing water temperature and salinity.
[3] Plaintiff also claims that the "piggybacking" of the two systems is unnecessary. The affidavit of plaintiff's expert stated:

This "piggybacking" of the liquid radwaste discharge system on a part of the once through cooling system is not an essential characteristic of the operation of a nuclear power plant. For example, a parallel canal could have been constructed for radwaste discharges and separate dilution pumps could have been utilized. (However, such designs are not in use currently.)
This contention is without merit. State v. Jersey Central Power & Light Co., supra, considered the same argument concerning the disposal of radwaste and held that the doctrine of preemption precluded the consideration of the issue. 69 N.J. at 115.
[4] It has been held that class actions for inverse condemnation can be maintained. See Foster v. Detroit, 405 F. 2d 138, 146 (6 Cir.1968). See City of San Jose v. Superior Ct. of Santa Clara Cty., 12 Cal.3d 447, 115 Cal. Rptr. 797, 525 P.2d 701 (Sup. Ct. 1974); Alevizos v. Metropolitan Airports Comm'n of Minneapolis & St. Paul, 298 Minn. 471, 497-498, 216 N.W.2d 651, 667-668 (Sup. Ct. 1974).
[5] The pertinent provisions of the New Jersey Constitution (1947) provide in part:

Private property shall not be taken for public use without just compensation. [Art. I, ¶ 20]
Any agency or political subdivision of the State or any agency of a political subdivision thereof, which may be empowered to take or otherwise acquire public property for any public * * * place, improvement, or use * * * but such taking shall be with just compensation. [Art. IV, § VI, ¶ 3]
The United States Constitution provides in pertinent part:
* * * [N]or shall private property be taken for public use without just compensation. [Amend. V]
* * * [N]or shall any State deprive any person of life, liberty, or property, without due process of law. [Amend. XIV]
[6] The California Constitution contains a "taking or damaging" provision. See Cal. Const., Art. I, § 14. In this case the California Supreme Court was concerned only with the "taking" aspect of its constitutional provision. To that extent, the decision is applicable to the instant matter.
[7] This holding is further buttressed by Congress' intent that if the Federal Government does the taking under the Atomic Energy Act, then just compensation must be paid. See 42 U.S.C.A. §§ 2063, 2075, 2138 and 2221.