181 N.J. Super. 516 (1981)
438 A.2d 563
GERRIT J. VAN DISSEL ET AL., PLAINTIFFS-APPELLANTS,
v.
JERSEY CENTRAL POWER & LIGHT COMPANY, A CORPORATION OF NEW JERSEY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 5, 1981.
Decided November 5, 1981.
*518 Before Judges BISCHOFF, KING and POLOW.
Edward J. Dauber and Alan R. Hoffman argued the cause for appellants (Greenberg & Dauber, attorneys; Edward J. Dauber and Alan R. Hoffman on the brief; Eugene M. Friedman of counsel).
Clarence P. Reberkenny argued the cause for respondent (Davis & Reberkenny, attorneys).
The opinion of the court was delivered by BISCHOFF, P.J.A.D.
This lawsuit, instituted as a class action, was brought on behalf of all riparian property owners who claimed to have an interest in property located on Forked River, Oyster Creek, Barnegat Bay and various lagoons, canals and inlets which are tributaries of those waterways. Defendant is Jersey Central *519 Power & Light Co. (JCP&L), a public utility of the State of New Jersey which constructed a nuclear power reactor plant near plaintiffs' properties. Plaintiffs contend that certain processes employed at the plant have caused damage to their properties by the creation of a warm water environment allowing for the proliferation of shipworms which have, in turn, destroyed wooden docks, appurtenances and other structures which extend into the waterways.
The complaint was filed on November 19, 1975, seeking money damages and a restraint against further operation of the plant in such a manner as to cause damage to plaintiffs and other members of subclasses. Eight theories of liability were set forth in the complaint:
1. Negligence.
2. Nuisance.
3. Trespass.
4. Strict Liability.
5. Violation of N.J. Water Pollution Control Statutes (N.J.S.A. 23:5-28, N.J.S.A. 58:10-23.1).
6. Violation of Refuse Act of 1899, 33 U.S.C. 407.
7. Violation of the Federal Water Pollution Prevention & Control Act, 33 U.S.C. 1251 et seq. and,
8. The unlawful taking of private property without just compensation or inverse condemnation.
A demand for jury trial of all issues was made. Defendant made a motion to dismiss the complaint for lack of jurisdiction over the subject matter, contending federal law had preempted the field. The trial judge, in an opinion reported at 152 N.J. Super. 391 (Law Div. 1977), relying in part upon State v. Jersey Central Power and Light Co., 69 N.J. 102 (1976), ruled that "Plaintiffs' attempts to seek money damages through the vehicle of tort claims constitutes at least an indirect interference with defendant's Radwaste Discharge System. Such state interference is impermissible. This court lacks subject matter jurisdiction over all of plaintiffs' claims based upon tort liability and statutory violations." 152 N.J. Super. at 403. He entered an order dismissing the first seven counts of the complaint. Defendant's *520 motion was denied with respect to plaintiffs' inverse condemnation claim. Additional pretrial motions resulted in the entry of relevant orders:
1. Dividing plaintiffs into nine subclasses related to geographic areas delineated on a subclass map;
2. Bifurcating the action as to liability and damages and
3. Directing that the issues of liability on the inverse condemnation claim be tried before a judge without a jury.
At the conclusion of the nine-day trial on liability the judge ruled, in essence, that as to subclass one defendant had caused the shipworm invasion in the area of the subclass, but that plaintiffs had not carried the burden of proving that the claimed damage had been caused by shipworm infestation. As to the other subclasses the judge ruled plaintiffs had failed to demonstrate that defendant's nuclear generating station had proximately caused the complained of damage. The complaint was dismissed. On this appeal plaintiffs challenge three rulings of the trial court. They contend it was error for the trial judge to
I. Rule that federal law had preempted the field;
II. Deny them a jury trial on the liability phase of the claim for damages based on inverse condemnation;
III. Hold that plaintiffs' had failed to demonstrate that their damages were proximately caused by defendant's operation of the Oyster Creek nuclear generating station (OCNGS).

I

Federal Preemption
The history of the licensing, construction and operation of defendant's plant is reviewed in detail in the opinion of the Supreme Court in State v. Jersey Central Power & Light Co., 69 N.J. 102, 105-106 (1976).
Defendant commenced operation of the nuclear generating station in December 1969. Plaintiffs allege that certain procedures *521 established for its continued operation has resulted in a significantly altered marine environment in the south branch of the Forked River-Oyster Creek waters in the area in which plaintiffs' properties are located. They contend that the operation of the plant, in particular the cooling system, has resulted in higher salinity levels, increased water flow and increased water temperatures. These changes, they allege, have permitted the proliferation of shipworms which have attacked and destroyed wooden docks, bulkheads and appurtenances belonging to plaintiffs.
Starting in 1966 Oyster Creek and Forked River were extensively altered in preparation for the nuclear generating station. Both were deepened, straightened and widened to allow for the construction of intake and discharge canals to service the generating station. Salinity levels in portions of the creek which had been brackish to freshwater were changed to higher salinities more characteristic of the bay.
The south branch of the Forked River serves as the intake canal and the flow of water is toward the generating station whenever the station is in operation and is no longer dependent upon the tidal flow.
Plaintiffs argue that the cooling system used by the generating station caused or contributed to the shipworm infestation by increasing water flow and releasing a fan-shaped area of warm water at the discharge canal outlet called a thermal plume. The evidence presented to the trial court of the effect of marine environment upon the proliferation of the various species of shipworms is extensively reviewed in the opinion of the trial court in 152 N.J. Super. at 396-398.
It is generally agreed that shipworm growth, survival and reproduction is dependent upon the presence of an untreated wood supply, water with constant salinities within certain ranges and water temperature within certain ranges.
At the center of this issue of preemption is the cooling system used by defendant. It was described by the trial judge as follows.

*522 Defendant's nuclear power plant utilizes a once-through cooling system to cool the steam produced by the defendant's condenser. Water used for this system is brought from the south branch of Forked River and is discharged into Oyster Creek. When water is drawn from the south branch of Forked River, this causes a partial reversal of the normal flow of the river. Through a suction-type operation, saline water is drawn from Barnegat Bay to Forked River, thereby making part of the river saline instead of its natural fresh water state.
The issue of federal preemption as it applies to this nuclear generating station and its cooling system was considered by the Supreme Court in State v. Jersey Central Power & Light Co. supra. After noting that a nuclear power plant cannot operate without a license from the Atomic Energy Commission and that it must "function in accordance with the license terms, including all technical specifications set forth in or attached to the license," id. at 112, the court held "Interference by the State, whether by statutory penalty, injunction or monetary damages, with these facets of nuclear power generation, regulation of which has been vested exclusively with the AEC, is not permissible."[1]Id. at 115.
Plaintiffs concede that this is so but argue here, as they did in the trial court, that the exclusive authority granted to the AEC to license and regulate relates solely to facility construction and operation with respect to radiological hazards, leaving the State free to regulate activities relating to the power plant for purposes other than protection against radiation hazards. Plaintiffs argue further that the exclusive federal regulatory jurisdiction over radiological hazards "in no way deprives a private citizen who has suffered personal or property damage from non-radiological impacts from pursuing his state tort claims against a licensee."
*523 Plaintiffs contend the first seven counts of the complaint seek recovery for damages arising from the construction and operation of the nuclear generating station  claims based solely upon injuries resulting from the plants nonradiological hazards caused by thermal pollution and environmental changes having no bearing upon the future operation of the plant's system for discharge of radioactive waste. To the contrary, the trial judge found that the alteration of water temperature is directly related to the cooling system which was authorized, approved and licensed by the AEC. Defendant is licensed to operate as it does; it cannot operate in any other manner. He found that the radioactive waste disposal system is an integral part of the cooling system. 152 N.J. Super. at 398. That factual finding has ample support in credible evidence present in the record as a whole and we will not disturb it. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474 (1974).
The conclusions of the trial judge that plaintiffs' assertion of tort and statutory claims for damages constitute at least an indirect interference with defendant's radioactive waste discharge system is affirmed, substantially for the reasons expressed by him.

II

Right to Jury Trial on Liability
From the inception of this litigation plaintiffs have demanded a jury trial of all issues. Defendant moved for a nonjury trial on the liability aspect of plaintiffs' inverse condemnation claim. That motion was granted and that ruling is challenged as error. The parties agreed that plaintiffs' claim under the eighth count of the complaint was a claim for damages grounded in inverse condemnation. It was also conceded that should the liability of defendant be established, plaintiffs were entitled, as a right, to a jury trial on damages. The dispute concerned plaintiffs' claim *524 that they were entitled to a jury trial on the liability aspect of their claim.
Plaintiffs initially argue that the trial judge improperly relied on the convenience aspects of a judge trial as opposed to a jury trial, since it was represented the case would be lengthy and complicated. It is clear that neither complexity nor length of trial is sufficient to deprive a party of a jury trial if he is entitled to it as a matter of right. Keiffer v. Food Products Trucking Co., 73 N.J. Super. 285, 297 (App.Div. 1962), certif. den. 37 N.J. 524 (1962); Longo v. Reilly, 35 N.J. Super. 405, 410 (App.Div. 1955), certif. den. 25 N.J. 45 (1957). There is no complexity exception to the right of trial by jury under either the Seventh Amendment to the U.S. Constitution or under the New Jersey Constitution. In re U.S. Financial Securities Litigation, 609 F.2d 411 (9 Cir.1979), (cert. den. in Gant v. Union Bank, 446 U.S. 929, 100 S.Ct. 1866, 64 L.Ed.2d 281 (1980), leaving standing the decision in 609 F.2d 411. However, reading the conclusion of the trial judge on this motion as a whole, we are satisfied he did not base his decision to grant defendant's motion upon the complexity of the issues or the convenience of a nonjury trial. He was of the view that there was no right to a jury trial on liability in a condemnation case, and he so ruled.
Plaintiffs argue their case involves basically an action for damages based upon a taking of plaintiffs' properties. They contend they are not seeking the equitable relief of a condemnation, or contesting a condemnation. They claim their action is akin to a tort action  that a taking had occurred and they were simply seeking damages. They argue that as in any tort action the issues for factual determination were: (1) whether the taking (or tort) had occurred, (2) were defendant's actions the proximate cause of the same and (3) damages. They argue that they did not seek equitable, injunctive or declaratory relief and that they were entitled to a jury trial as of right. They buttress their arguments by citation to cases in seven other jurisdictions which, they claim, have decided that an inverse condemnation *525 plaintiff has a right to a jury trial on liability as well as damages.[2]
"The constitutional guarantee that `The right of trial by jury shall remain inviolate ...,' N.J.Const. (1947), Art. I, par. 9, merely preserves the right to a jury trial that existed at common law at the time the New Jersey Constitution of 1776 was adopted." Peterson v. Albano, 158 N.J. Super. 503, 506 (App.Div. 1978), app. dism. 78 N.J. 337 (1978); Plaza v. Flak, 7 N.J. 215, 224 (1951); Montclair v. Stanoyevich, 6 N.J. 479, 485 (1951); Steiner v. Stein, 2 N.J. 367, 378-379 (1949).
There are many civil proceedings known to the common law which were not triable as of right to a jury and hence were not embraced in the constitutional guarantee which came into force July 2, 1776. Steiner v. Stein, 2 N.J. at 379; cf. Montclair v. Stanoyevich, 6 N.J. at 483. There are also contemporary proceedings which were unknown at common law and which are outside the orbit of the constitutional guarantee of a jury trial (for a partial listing of such actions see 2 Schnitzer & Wildstein, N.J. Rules Service AIV 1256-1260).
Among such contemporary actions which are not triable to a jury as of right are proceedings to condemn property under the power of eminent domain. In re Newark Housing Auth., 126 N.J.L. 60, 64 (E. & A. 1941); Morris v. Comptroller, 54 N.J.L. 268, 273 (Sup.Ct. 1892).
Condemnation proceedings are instituted by the condemning authority to assure that the landowner whose property *526 has been taken will receive proper compensation. Inverse condemnation proceedings are initiated by the landowner whose property has been taken de facto to obtain proper compensation. In re Jersey Central Power & Light Co., 166 N.J. Super. 540, 544 (App.Div. 1979). Both actions are controlled by the same statute. N.J.S.A. 20:3-1 et seq. Bayshore Sew. Co. v. Dep't, Environmental Protection, 122 N.J. Super. 184, 202 (Ch.Div. 1973), aff'd 131 N.J. Super. 37 (App.Div. 1974). The owner's action of inverse condemnation is based on an alleged violation of both federal and state constitutional guarantees of just compensation for property taken for public use. This action is a modern-day concept and post dates the constitutional right to jury trial. New Jersey's first Constitution of 1776 made no reference to the taking clause. It did not appear until the New Jersey Constitution (1844), Art. I. ¶ 16, Art. VII, ¶ 8. It appears in the United States Constitution in Amendments V and XIV.
The right to maintain such proceedings is foreign to the common law and as such the constitutional right to a jury trial does not attach. Kugler v. Market Develop. Corp., 124 N.J. Super. 314, 319 (Ch.Div. 1973); Quinchia v. Waddington, 166 N.J. Super. 247 (Law Div. 1979).
Although plaintiffs cite out-of-state cases in support of their contention that they are entitled to a jury trial, this issue is one that is decided by the individual states because the issue is related to the constitution, statutes and rules of procedure of the individual State. (See Port of N.Y. Auth. v. Heming, 34 N.J. 144 (1961), cert. den. 367 U.S. 487, 81 S.Ct. 1676, 6 L.Ed.2d 1241 (1961), where the court (at 156) noted the different procedures employed by the individual states in condemnation proceedings.
There are two basic issues involved in plaintiffs' claim. The second is damages, but before that issue can be reached there must first be a determination as to whether there has been a taking, and if there has been, what is the nature and extent of *527 the taking. The taking cannot be presumed. And as to that issue there is no right to a jury trial. We affirm the ruling of the trial judge.

III

The Trial Court's Factual Findings and Conclusions.
Plaintiffs' point heading on this issue is as follows.
The Trial Court's Findings and Conclusions That The Dock of The Subclass 1 Plaintiff Had Not Been Destroyed by Shipworms, That JCP&L Had Not Proximately Caused The Shipworm Damages Suffered By The Other Plaintiffs, And That JCP&L Had Not Proximately Caused The Erosion Of Properties Owned By Plaintiffs In Subclasses 1, 2, 7 and 8 And The Siltation At Properties Owned by Plaintiffs In Subclasses 1 and 8 Were Clearly Mistaken and So Plainly Unwarranted That The Interests Of Justice Require That They Be Reversed And Corrected.
Plaintiffs contend that the trial judge's "general findings of fact" and the "factual findings relating to each Subclass," as well as his conclusions, are patently in error and correction and reversal by this court is warranted. Plaintiffs argue that the dispute does not center around credibility but rather involves the judge's failure to properly evaluate the underlying facts and the implications to be drawn therefrom. Plaintiffs rely upon Pioneer Nat'l Title Ins. Co. v. Lucas, 155 N.J. Super. 332 (App. Div. 1978), aff'd o.b. 78 N.J. 320 (1978), where the standard of review was stated as follows:
If we are satisfied that the trial judge's findings and result could reasonably have been reached on sufficient credible evidence in the record as a whole, his determination should not be disturbed. However, if we are thoroughly satisfied that the findings and the ultimate conclusions are clearly mistaken and so plainly unwarranted that the interests of justice demand intervention and correction, we should appraise the record as if we were deciding the matter at inception and make our own findings and conclusions. This feeling of "wrongness" arises where our review of the proofs leaves us with the definite conviction that the judge went so wide of the mark that a mistake must have been made. It can arise in many ways  from manifest lack of inherently credible evidence to support significant findings, obvious overlooking or underevaluation of crucial evidence, or a clearly unjust result. [at 338]
*528 Defendant, on the other hand, argues that credibility of expert witnesses, as well as the "feel of the case" is involved and that the proper standard of review is that articulated in Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484 (1974), where the court said that findings on which a judgment in a nonjury case are based should not be disturbed unless "they are so wholly unsupportable as to result in a denial of justice." Stated otherwise, the factual findings and legal conclusions of the trial judge will not be disturbed unless the appellate court is convinced that they are so manifestly unsupported by or inconsistent with competent, relevant and reasonably credible evidence as to offend the interests of justice. Ibid.
At the end of the nine-day trial the judge made findings and conclusions as to each of the subclasses. Each of the subclass representatives claimed to have suffered damages to one or more wood structures consisting of pilings, docks and bulkheads. The trial judge noted that no damage appeared to have occurred to structures constructed of pressure-creosoted materials and pointed out that the conflicting testimony raised an issue as to whether the damages complained of resulted from shipworm infestation or were the result of winter freezes of lagoon water which damaged pilings and docks.
The testimony presented was technical, complicated and voluminous. The resolution of the sharply divergent factual statements and expert opinions required a delicate weighing and balancing of the evidence presented. Our review of this record satisfies us that there was sufficient credible evidence presented as to each of the subclasses on which the trial judge could base his conclusions. We reach the same result applying either the test as it is stated in Rova Farms or Pioneer Nat'l Title Ins. In our review of the record we did not encounter a feeling of wrongness, nor did we find the ultimate conclusions of the trial judge clearly mistaken or plainly unwarranted.
Affirmed.
NOTES
[1] The Energy Reorganization Act of 1974, Pub.L. 93-438, 88 Stat. 1233, which became effective January 19, 1975, abolished the Atomic Energy Commission and transferred its functions to two new agencies, Energy Research and Development Administration and Nuclear Regulatory Commission. All licensing and related regulatory functions of the Atomic Energy Commission have been transferred to the Nuclear Regulatory Commission. State v. Jersey Central Power & Light Co., 69 N.J. 102, n. 105.
[2] Thornburg v. Port of Portland, 244 Or. 69, 415 P.2d 750 (Sup.Ct. 1966); Wilson v. State Road Department, 201 So.2d 619 (Fla.Ct.App. 1967), cert. den. 207 So.2d 690 (1967); Cunningham v. Town of Tieton, 60 Wash.2d 434, 374 P.2d 375 (Sup.Ct. 1962); Douglas County v. Abercrombie, 119 Ga. App. 727, 168 S.E.2d 870 (1969); Commonwealth Department of Highways v. Watson, 446 S.W.2d 294 (Ky. 1969); Tantalas v. Commonwealth, 392 Pa. 315, 140 A.2d 790, 791-792 (Sup.Ct. 1958); Sanders v. State Highway Commission, 211 Kan. 776, 508 P.2d 981, 988-989 (1973).