194 N.J. Super. 108 (1984)
476 A.2d 310
GERRIT J. VAN DISSEL, ET AL., PLAINTIFFS-APPELLANTS,
v.
JERSEY CENTRAL POWER & LIGHT COMPANY, A CORPORATION OF NEW JERSEY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 7, 1984.
Decided May 30, 1984.
*109 Before Judges BISCHOFF, KING and PETRELLA.
Edward J. Dauber argued the cause for appellants (Greenberg & Dauber, attorneys; Alan R. Hoffman and Eugene M. Friedman, of counsel; Alan R. Hoffman on the brief).
Clarence P. Reberkenny argued the cause for the respondent (Davis & Reberkenny, attorneys; Clarence P. Reberkenny and Robert F. Blomquist, on the brief).
*110 Richard E. Shapiro argued the cause for amicus curiae, the Department of the Public Advocate (Joseph H. Rodriguez, Public Advocate of the State of New Jersey; Michael L. Perlin, special counsel to the Commissioner; Richard E. Shapiro and Michael L. Perlin, of counsel and on the brief).
The opinion of the Court was delivered by BISCHOFF, P.J.A.D.
This appeal is before this Court pursuant to an order entered by the United States Supreme Court on January 23, 1984 reading as follows:
"The petition for writ of certiorari is granted. The judgment is vacated and the case is remanded to the Superior Court of New Jersey, Appellate Division, for further consideration in light of Silkwood v. Kerr-McGee Corporation, 464 U.S. ___ [104 S.Ct. 615, 78 L.Ed.2d 443] (1984)."
464 U.S. ___, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984).[1]
The procedural history and factual background of this case is set forth in full in a prior opinion of this Court reported at 181 N.J. Super. 516 (App.Div. 1981) and in the opinion of the trial court reported at 152 N.J. Super. 391 (Law Div. 1977). The facts are restated here in brief in order to place our "further consideration" in proper perspective.
This action was instituted as a class action by Gerrit Van Dissel on behalf of "all riparian property owners who claimed to have an interest in property located on Forked River, Oyster Creek, Barnegat Bay and various lagoons, canals and inlets which are tributaries of these waterways." The suit named as defendant the Jersey Central Power & Light Co., a public utility of the State of New Jersey which constructed and operates a nuclear power reactor plant near plaintiff's property.
The complaint sought money damages and a restraint against further operations of the plant in such a manner as to cause *111 damage to plaintiff and the other members of the class. The complaint set forth eight different causes of action: negligence, nuisance, trespass, strict liability, violation of the New Jersey Water Pollution Control Statute (N.J.S.A. 23:5-28; N.J.S.A. 58:10-23.1 et seq.), violation of the Refuse Act of 1899 (33 U.S.C. 407), violation of the Federal Water Pollution Prevention and Control Act (33 U.S.C. 1251), and inverse condemnation. Van Dissel, 181 N.J. Super. at 519.
Defendant's plant commenced operation in 1969. Plaintiffs allege that the design, construction and continued operation of the plant had resulted in a significantly altered marine environment in the water adjacent to plaintiffs' properties resulting in higher salinity levels, increased water flow and increased water temperatures. These changes, it is alleged, have permitted the proliferation of shipworms which have attacked and destroyed wooden docks, bulkheads and appurtenances belonging to plaintiffs.
The increase in salinity, temperature and water flow it is conceded results from the design and operation of the cooling system and the Radwaste Discharge System. The design and method of operation of these two systems is described in detail in three reported opinions: State v. Jersey Central Power & Light Co., 69 N.J. 102, 106-108 (1976); Van Dissel v. New Jersey Central Power & Light, 181 N.J. Super. at 521-522 and 152 N.J. Super. at 397-398. We need not repeat that description here.
Defendant moved to dismiss the complaint contending the trial court lacked subject matter jurisdiction because federal law had preempted the field. The trial court, at 152 N.J. Super. 391 (Law Div. 1977), granted the motion as to the first seven counts of the complaint and denied the motion as to the demand for damages based on the claim of unlawful taking of property without just compensation. That inverse condemnation claim was tried before a judge without a jury and resulted in a determination by the trial judge that as to one subclass of *112 plaintiffs they had established that defendant had caused a "shipworm invasion in the area of the subclass, but that plaintiffs had not carried the burden of proving the claimed damages had been caused by shipworm infestation." As to other subclasses of plaintiffs the judge ruled that they "had failed to demonstrate that defendant's nuclear generating station had proximately caused the complaint of damage. The complaint was dismissed." Van Dissel, 181 N.J. Super. at 520.
On appeal to this Court we affirmed the trial court's dismissal of the complaint. Van Dissel, 181 N.J. Super. 516. Plaintiffs' petition for certification to the New Jersey Supreme Court was denied, 89 N.J. 409 (1982), and plaintiffs' appeals to that Court were dismissed. (Order dismissing appeal No. 19,201 dated February 8, 1982, filed February 17, 1982, September Term 1983).
Plaintiff then filed in the United States Supreme Court a writ of certiorari to the N.J. Supreme Court stating the single "question presented" as follows:
Are common law tort claims brought in state court by local property owners against the owner and operator of a nuclear power plant for damage to their property due to the plant's thermal pollution of local coastal waters federally preempted by the Atomic Energy Act of 1954, as amended, 42 U.S.C. § 2011 et seq?
As we indicated above, the writ was granted, the judgment vacated and the case remanded to us for further consideration in light of Silkwood v. Kerr-McGee Corp. 464 U.S. ___, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). Plaintiff's motion for direct certification by the New Jersey Supreme Court was denied. Order No. 22,207 entered March 13, 1984, filed March 15, 1984, M-655 September Term 1983.

FEDERAL PREEMPTION
Our reconsideration of the federal preemption claim commences with an examination of the case of Pacific Gas & Elec. v. Energy Res. Comm'n., 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). The precise issue presented by that case was "whether the 1954 Atomic Energy Act, 68 Stat. 921, as *113 amended 42 U.S.C. § 2011 et seq., preempted California's authority to condition the construction of a nuclear facility in California on the State's finding that adequate means of disposal were available for the plant's nuclear waste." Silkwood, 464 U.S. at ___, 104 S.Ct. at 627, 78 L.Ed.2d at 459 (noted in the dissenting opinion of Justice Blackmun). The Court concluded that "... federal preemption of nuclear safety regulations was full and complete...." Id. at ___, 104 S.Ct. at 627, 78 L.Ed. at 460. It held that:
Congress, in passing the 1954 Act and in subsequently amending it, intended that the federal government should regulate the radiological safety aspects involved in the construction and operation of a nuclear plant, but that the States retain their traditional responsibility in the field of regulating electrical utilities for determining questions of need, reliability, cost and other related state concerns. [Pacific Gas, 461 U.S. 190, ___, 103 S.Ct. 1713, 1723, 75 L.Ed.2d 752, 765 (1983)].
In emphasizing the nature and extent of this preemption, the court said:
... State safety regulation is not preempted only when it conflicts with federal law. Rather, the federal government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the states. When the federal government completely occupies a given field or an identifiable portion of it, as it has done here, the test of preemption is whether "the matter on which the state asserts the right to act is in any way regulated by the federal government." Rice v. Santa Fe Elevator Corp., supra [331 US 218], at 236, 91 LEd 1447, 67 SCt 1146 [at 1155]. A state moratorium on nuclear construction grounded in safety concerns falls squarely within the prohibited field. Moreover, a state judgment that nuclear power is not safe enough to be further developed would conflict directly with the countervailing judgment of the NRC, see infra, at ___ US ___, 75 LEd2d 774-776 [103 SCt 1729-1730], that nuclear construction may proceed notwithstanding extant uncertainties as to waste disposal. A state prohibition on nuclear construction for safety reasons would also be in the teeth of the Atomic Energy Act's objective to insure that nuclear technology be safe enough for widespread development and use  and would be preempted for that reason. [Pacific Gas, 461 U.S. 190, ___-___, 103 S.Ct. 1713, 1722, 1726-1727, 75 L.Ed.2d 752, 765, 770-771 (1983) (footnote omitted)].
Despite this statement of a broad federal preemption for nuclear safety concerns and the court's recognition that the California statute had an effect on safety of nuclear plant operations, the Court upheld the statute because its purpose *114 was economic. In describing the holding of the Pacific Gas case, Justice Blackmun, dissenting in Silkwood, said:
... The Court concluded that the State had adopted the regulation to prevent investments in power plants that were likely to become white elephants due to inadequate nuclear waste storage facilities. Ibid. Because Congress had not meant the Atomic Energy Act to deprive States of the right to make economic decisions concerning nuclear power, the Court concluded that the regulation was not preempted. Thus, the fundamental teaching of Pacific Gas is that state regulation of nuclear power is pre-empted to the extent that its purpose is to regulate safety. [Silkwood, 464 U.S. at ___, 78 L.Ed.2d at 460, 104 S.Ct. at 627 (1984)].
The significance of that holding with relation to our present inquiry is that all parties agree that the design, construction and operation of the cooling system and the Radwaste Discharge System constitutes a safety feature of the Jersey City Power & Light Nuclear Power Generating Station.
The court opened its opinion in Silkwood, decided the next term of court, with this statement:
Last term, this Court examined the relationship between federal and state authority in the nuclear energy field and concluded that states are precluded from regulating the safety aspects of nuclear energy. Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Comm'n, 461 U.S. 190, ___, 75 LEd2d 752, 103 SCt 1713 [1726] (1983). This case requires us to determine whether a state-authorized award of punitive damages arising out of the escape of plutonium from a federally-licensed nuclear facility is preempted either because it falls within that forbidden field or because it conflicts with some other aspect of the atomic energy Act. [464 U.S. at ___, 78 L.Ed.2d at 447, 104 S.Ct. at 617].
Karen Silkwood was employed by Kerr-McGee Corp. in a plant where plutonium fuel pins for use as reactor fuel in nuclear power plants were manufactured. She was contaminated by the escape of plutonium and its contact with her skin. Her contamination spread to her personal belongings. A few days later she was killed in an unrelated automobile accident.
Karen's father, as administrator of her estate, instituted an action against Kerr-McGee under Oklahoma common law principles to recover damages for injuries to Karen's person and property. It was stipulated that the plutonium which caused the contamination came from the Kerr-McGee plant. The jury *115 returned verdicts for compensatory damages for injuries to Karen of $500,000, for property damage of $5,000 and a punitive damage award of $10,000,000. The case was appealed to the 10th Circuit which held that because of federal preemption, punitive damages could not be awarded. That court reasoned that "A judicial award of exemplary damages under state law as punishment for bad practices or to deter future practices involving exposure to radiation is no less intrusive than direct legislative acts of the state." That court held the award for punitive damages was preempted by federal law and reversed it. 667 F.2d 908, 923 (10th Cir.1981).[2]
Silkwood appealed seeking review of that ruling with respect to the punitive damage award. Kerr-McGee argued in the Supreme Court that "because the state-authorized award of punitive damages in this case punishes and deters conduct related to radiation hazards, it falls within the prohibited field." Id., 464 U.S. at ___, 104 S.Ct. at 622, 78 L.Ed.2d at 453. The Court disagreed and held there was ample evidence that Congress had no intention of forbidding states from providing such remedies as punitive damages under state law for those suffering from injuries from radiation in a nuclear plant. The Court said:
Indeed, there is no indication that Congress even seriously considered precluding the use of such remedies either when it enacted the Atomic Energy Act in 1954 and or when it amended it in 1959. This silence takes on added significance in light of Congress' failure to provide any federal remedy for persons injured by such conduct. It is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct.
More importantly, the only congressional discussion concerning the relationship between the Atomic Energy Act and state tort remedies indicates that Congress assumed that such remedies would be available.
........

*116 Although the Price-Anderson Act does not apply to the present situation, the discussion preceding its enactment and subsequent amendment indicates that Congress assumed that persons injured by nuclear accidents were free to utilize existing state tort law remedies.
........
Congress clearly began working on the Price-Anderson legislation with the assumption that in the absence of some subsequent legislative action, state tort law would apply.... [464 U.S. at ___-___, 78 L.Ed.2d at 454-455, 104 S.Ct. at 622-623].
The Court concluded this portion of its opinion saying:
In sum, it is clear that in enacting and amending the Price-Anderson Act, Congress assumed that state-law remedies, in whatever form they might take, were available to those injured by nuclear incidents. This was so even though it was well aware of the NRC's exclusive authority to regulate safety matters. No doubt there is tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion that a state may nevertheless award damages based on its own law or liability. But as we understand what was done over the years in the legislation concerning nuclear energy, Congress intended to stand by both concepts and to tolerate whatever tension there was between them. We can do no less. It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something that Congress was quite willing to accept. [464 U.S. at ___, 78 L.Ed.2d at 457, 104 S.Ct. at 625]
Kerr-McGee focused on the differences between compensatory damage awards and punitive damage awards and asserted that, at most, Congress intended to allow the former and reject the latter. This argument was rejected by the Court saying: "Punitive damages have long been a part of traditional state tort law. As we noted above, Congress assumed that traditional principles of state tort law would apply with full force unless they were expressly supplanted." Id., 464 U.S. at ___, 78 L.Ed.2d at 457, 104 S.Ct. at 625.
Defendant herein contends Silkwood carves out a very narrow exception to the flat prohibition against any state regulation by either legislation or tort law of safety matters relating to nuclear power plants, and that this narrow exception requires an allegation of "damages for radiation injury."
*117 This argument is bottomed on the court's repeated references to the nature of Karen Silkwood's injuries as being the result of "the escape of plutonium" or "contamination by plutonium" and "Escape of plutonium caused by grossly negligent, reckless and willful conduct." Defendant also relies on the court's repeated references to "nuclear incident", "nuclear accidents", "extraordinary nuclear occurrences" and the statutory and regulatory definition of these terms. 464 U.S. at ___ n. 14, ___ n. 15, 104 S.Ct. at 624 n. 14, 625 n. 15, 78 L.Ed.2d at 455 n. 14, 456 n. 15. Defendant concludes that since plaintiffs do not allege radiation damages the claims are in the nature of preempted safety regulations and plaintiffs' claim is barred.
Defendant also argues that in Silkwood there was proven violations of the safety regulations by Kerr-McGee in the past. Id. 464 U.S. at ___, 104 S.Ct. at 619, 78 L.Ed.2d at 449, as well as the fact that Karen's injuries were the result of the escape of plutonium. On the other hand, the record in this case is lacking in any proof that defendant JCP & L operated its nuclear power plant in a manner otherwise than as "authorized, approved and licensed."
We do not view the holding in Silkwood as so narrowly constructed. This conclusion finds support in the vigorous dissent of Justice Blackmun. He focused on the difference between compensatory damages and punitive damages and said:
... Compensatory damages therefore have an indirect impact on daily operations of a nuclear facility. But so did the state statute upheld in Pacific Gas. The crucial distinction between compensatory and punitive damages is that the purpose of punitive damages is to regulate safety, whereas the purpose of compensatory damages is to compensate victims. Because the Federal Government does not regulate the compensations of victims, and because it is inconceivable that Congress intended to leave victims with no remedy at all,[7] the pre-emption analysis established in Pacific Gas comfortably accommodates  indeed it compels  the conclusion that compensatory damages are not pre-empted whereas punitive damages are.
Differences in the means of calculating compensatory and punitive damages further distinguish the two, and highlight the fundamental incompatibility of punitive damages and federal standards. When a victim is determined to be *118 eligible for a compensatory award, that award is calculated by reference to the victim's injury. Whatever compensation standard a State imposes, whether it be negligence or strict liability, a licensee remains free to continue operating under federal standards and to pay for the injury that results. This presumably is what Congress had in mind when it pre-empted state authority to set administrative regulatory standards but left state compensatory schemes intact. Congress intended to rely solely on federal expertise in setting safety standards, and to rely on States and juries to remedy whatever injury takes place under the exclusive federal regulatory scheme. Compensatory damages therefore complement the federal regulatory standards, and are an implicit part of the federal regulatory scheme. [464 U.S. at ___, 104 S.Ct. at 629, 78 L.Ed.2d at 462].
Footnote 7 of Blackmun's dissent states "the absence of federal regulations governing the compensation of victims of nuclear accidents, is strong evidence that Congress intended the matter to be left to the States."
Justice Blackmun argues for the proposition that Congress always assumed that victims harmed by the generation of nuclear power would be compensated under State law. The majority does not disagree with that premise. The only point of disagreement relates to permissible awards of punitive damages. It would indeed be incongruous to hold that punitive damages could be recovered under Silkwood but not compensatory damages. We decline to read Silkwood as standing for that proposition.
Nor do we believe that it was the intent of Congress or the Supreme Court to hold that victims injured by the approved and authorized design, construction and operation of safety features could only be compensated if the injuries were caused by a nuclear accident, nuclear hazard or extraordinary nuclear occurrence. No intent to cast adrift without compensation, victims otherwise injured by the generation of nuclear power can be discerned from the statute, regulations or authorities that have considered the issue.
We hold that plaintiff's claim for compensatory damages is not barred by federal preemption.

*119 COLLATERAL ESTOPPEL
That does not end our inquiry, however, because of defendant's claim that plaintiffs are barred from trying the issue embodied in the first seven counts of the complaint by the principle of collateral estoppel, even if we should find them not precluded by federal preemption. Defendant contends the trial judge found the plaintiffs had failed to prove proximate causation between the alleged taking (based on claimed shipworm damage) and the design, construction and operation of defendant's nuclear power plant; that we affirmed that finding; that our Supreme Court denied plaintiffs' petition for certification of the case and the issue was not before the United States Supreme Court. Therefore, defendant claims the issue of proximate cause has been conclusively determined adversely to plaintiffs' position and since plaintiffs had a full and fair opportunity to litigate the proximate cause issue, they are "collaterally estopped from relitigating the issue of cause in fact as to any other claim they might now have."
On the other hand, plaintiffs claim that the application of the doctrine of collateral estoppel would deprive them of a right to trial by jury under the New Jersey Constitution of 1947, Art. I, Sec. 9, relying on Suchit v. Baxt, 176 N.J. Super. 407, 415 (Law Div. 1980) and State v. Ingenito, 87 N.J. 204, 216-217 (1981). Plaintiffs claim that to rely upon the trial court's finding of proximate cause in the non-jury trial of the inverse condemnation claim so as to defeat their common-law tort claims would deny them their fundamental rights under the New Jersey Constitution to present those claims to a jury.
"An essential element of plaintiffs' cause of action for negligence, or for that matter for any other tort, is that there be some reasonable connection between the act or omission of the defendant and the damage which plaintiff suffered. This connection usually is dealt with by the courts in terms of what is called `proximate cause' or `legal cause'." Prosser, Law of Torts, § 41 (4th Ed. 1971). This element of proximate cause *120 applies in the context of both statutory and common law causes of action. In State v. Jersey Central Power & Light Co., 69 N.J. 102 (1976), the New Jersey Department of Environmental Protection brought an action against JCP & L for alleged state statutory violations arising out of the operation of the very plant with which we are here concerned. It was alleged the improper operation of the plant resulted in a large "fish kill". The Supreme Court held plaintiff's claim to be deficient in two respects: 1) lack of proof of causation linking the fish kill to the operation of the plant, and 2) federal preexemption.
It is clear that the element of proximate cause is essential to a cause of action for damages grounded in either a statutory or common law breach of duty. The issue is whether litigation of this issue in the inverse condemnation case bars its relitigation with respect to plaintiff's asserted common law and statutory claims.
In Plainfield v. PSE & G, 82 N.J. 245, 257 (1980), the court addressed this issue as follows:
The general rule regarding "issue preclusion" arising out of prior judgments was expressed by this Court in Washington Tp. v. Gould, 39 N.J. 527, 533 (1963), as follows:
It is well-settled that where a judgment of a court of competent jurisdiction directly determines a right, question or fact distinctly put in issue, such judgment estops the parties or their privies from thereafter relitigating the same issue in a subsequent proceeding between them, regardless of its nature or form.
In State v. Gonzalez, 75 N.J. 181, 186 (1977), it was stated that "[c]ollateral estoppel is that branch of the broader law of res judicata which bars relitigation of any issue which was actually determined in a prior action, generally between the same parties, involving a different claim or cause of action." See United Rental Equip. Co. v. Aetna Life & Cas. Ins. Co., 74 N.J. 92, 101 (1977); State v. Ingenito, 169 N.J. Super. 524, 531 (App.Div. 1979); Gareeb v. Weinstein, 161 N.J. Super. 1, 15 (App.Div. 1978). The general rule was formulated in the Restatement (Second) of Judgments § 68 at 1 (Tent.Draft No. 4, 1977) as follows:
When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.

*121 See generally Currie, "Res judicata: The Neglected Defense." 45 U.Chi.L. Rev. 317 (1978); Note, "Res judicata: Cause v. Common Law," 22 Loyola L.Rev. 221 (1976).
In New Jersey the doctrine of issue preclusion whether it be res judicata or collateral estoppel precludes only questions "distinctly put in issue" and "directly determined adversely to the party against which the estoppel is asserted." Eatough v. Bd. of Medical Examiners, 191 N.J. Super. 166, 175 (App.Div. 1983); see also New Jersey-Philadelphia, etc. v. N.J. State Board, 654 F.2d 868, 876 (3rd Cir.1981), citing City of Plain-field v. Public Service Gas & Electric, 82 N.J. 245, 257-258 (1980); N.J. Manufacturers Insurance Co. v. Brower, 161 N.J. Super. 293, 297 (App.Div. 1978).
The issue of proximate cause previously determined in the trial court and affirmed by this court clearly falls within that definition. Plaintiff had a full and fair opportunity to litigate the issue in the inverse condemnation proceeding and is barred from relitigating that same issue. Accord Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); see also Parklane Hosiery Company, Inc. v. Shore, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), Restatement, Judgments 2d § 27 at 250 (1980).
The precise issue of proximate cause previously determined would be a necessary ingredient in plaintiffs' proofs should the previously dismissed seven counts of plaintiffs' complaint proceed to trial because the common-law tort claims and statutory claims (assuming a private cause of action for a breach thereof) asserted by plaintiff in the first seven counts all require the proof of the same element of causation in fact that was required in the inverse condemnation claim.
The remand of the United States Supreme Court for reconsideration of this case in light of Silkwood does not render null and void the past procedural history of this case. Indeed it is clear that federal courts are required to give preclusive effect to state court judgments whenever the courts of the *122 state from which the judgment emerged would do so. Kremer v. Chemical Construction Corp., 456 U.S. 461, 481-482, 102 S.Ct. 1883, 1897-1898, 72 L.Ed.2d 262, reh'g. den. 458 U.S. 1133, 103 S.Ct. 20, 73 L.Ed.2d 1405 (1982).
We address plaintiffs' contention that application of collateral estoppel would violate their right to a jury trial guaranteed them under the Seventh Amendment of the United States Constitution and under the New Jersey Constitution of 1947, Art. I, sec. 9. This is based on the fact that plaintiff initially made a demand for jury trial of all claims and the inverse condemnation was tried without a jury.
The holding and the reasoning of Parklane Hosiery Company, Inc. v. Shore, supra, is dispositive of this contention under both constitutions. The Court there stated:
This case presents the question whether a party who has had issues of fact adjudicated adversely to it in an equitable action may be collaterally estopped from relitigating the same issues before a jury in a subsequent legal action brought against it by a new party. [Id. 439 U.S. at 324, 58 L.Ed.2d at 557-558, 99 S.Ct. at 648.]
In that case the Supreme Court approved the holding of the 7th Circuit that "A party who has had issues of fact determined against him after a full and fair opportunity to litigate in a nonjury trial is collaterally estopped from obtaining a subsequent jury trial of these same issues of facts ... The Seventh Amendment preserves the right to trial by jury only with respect to issues of fact [and] once those issues have been fully and fairly adjudicated in a prior proceeding nothing remains for trial either with or without a jury."
The Supreme Court held that the application of collateral estoppel in this context does not violate the Seventh Amendment to the United States Constitution. "If collateral estoppel is otherwise warranted, the jury trial question should not stand in the way." Id., 439 U.S. at 334, n. 21, 99 S.Ct. at 653 n. 21, 58 L.Ed.2d at 563 n. 21. If this is so where the parties are not identical as in the Parklane case, the conclusion is even more applicable here where the parties are identical.
*123 We see no reason to apply a different standard on this issue to our New Jersey Constitutional guarantee of a jury trial. See Van Dissel, supra, 181 N.J. Super. at 525, and cases therein cited.
Plaintiffs' reliance on State v. Ingenito, 87 N.J. 204, is misplaced. That case involved the use by the prosecutor in a second criminal trial of a defendant of that defendant's prior conviction to establish one element of the crime for which he was charged in the second trial. The Court was there confronted with a criminal matter and was properly concerned that the jury's fact-finding process be all inclusive and encompass the evaluation of the credibility of all witnesses. Id., at 211. The conclusion of the Court indicates quite clearly the fact that its holding was limited to criminal cases.
These considerations lead us to conclude that the right to a jury in a criminal trial ordinarily includes the right to have the same trier of the fact decide all of the elements of the charged offense. Unless the same jury is permitted to deliberate meaningfully upon all of the issues that are crucial to a verdict of guilt or innocence of the particular crime charged, a defendant will not have secured the jury right contemplated by the Constitution. Collateral estoppel against a defendant in the context of the criminal trial is inconsistent with this proposition. [87 N.J. at 217 (emphasis in original)].
The policy concerns which compelled the Ingenito result are not present here.
In summary we hold on "further consideration" that:
1. Federal preemption does not bar plaintiffs' claim for compensatory property damages, but
2. Plaintiff has already had one full and fair trial of the issue of proximate cause which is an essential ingredient of plaintiff's other claims and the principles of issue preclusion, i.e., res judicata and collateral estoppel, effectively bar relitigation of that issue.
The judgment entered in the trial court dismissing plaintiffs' complaint is affirmed.
NOTES
[1] For a helpful article on the ambiguous message conveyed by summary reconsideration orders of the United States Supreme Court see "Granted, vacated, and remanded"  Judicature, Vol. 67, No. 8, page 390 (March 1984).
[2] The compensatory damage award of $500,000 was reversed by that court because "recovery for Silkwood's personal injuries was controlled exclusively by Oklahoma's Workmens Compensation Law." 464 U.S. at ___, 104 S.Ct. at 620, 78 L.Ed.2d at 450.